*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0090P (6th Cir.)
File Name: 04a0090p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

TOMMY RAY WARREN,
  *Petitioner-Appellee,*

  *v.*

  No. 02-5983

VIRGINIA LEWIS, Warden,
  *Respondent-Appellant.*

———————————

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 02-00228—John T. Nixon, District Judge.

Argued: September 16, 2003

Decided and Filed: March 30, 2004

Before: SILER, BATCHELDER, and COOK, Circuit
Judges.

———————————

**COUNSEL**

**ARGUED:** David H. Findley, OFFICE OF THE
ATTORNEY GENERAL, Nashville, Tennessee, for
Appellant. Charles E. Walker, Nashville, Tennessee, for
Appellee. **ON BRIEF:** David H. Findley, OFFICE OF
THE ATTORNEY GENERAL, Nashville, Tennessee, for

Appellant. Charles E. Walker, Nashville, Tennessee, for
Appellee.

———————————

**OPINION**

———————————

ALICE M. BATCHELDER, Circuit Judge. Virginia Lewis
("Lewis") appeals the decision of the district court granting
habeas corpus to Petitioner Tommy Ray Warren ("Warren").
Because we find that the state court proceedings in question
did not result in a decision that is contrary to, or involve an
unreasonable application of clearly established federal law as
determined by the United States Supreme Court, we reverse.

**I.**

On April 12, 1993, Tommy Ray Warren pled guilty to two
counts of first degree murder and was sentenced to two
consecutive life terms. At the guilty plea hearing, the State
advised that, if the case went to trial, the State would prove
that on March 24, 1992, while driving his truck, Mr. Warren
struck Della May Richter and Patricia Weaver, killing
Weaver. Warren then kidnaped Richter and stabbed her to
death. Mr. Warren specifically agreed that these facts were
correct.

At his post-conviction hearing, Mr. Warren gave a more
colorful recitation of the facts. On March 24, 1992, he said,
he got off work early and spent the day driving around in his
truck, drinking beer and smoking marijuana. Following the
consumption of what he estimated to have been 3 or 4 six-
packs of beer, he hit a pothole, which caused him to lose
control of his truck and to strike two women who were
walking along the road. He claimed that the impact caused
his pocket knife to slide off the seat, that he reached down and
picked the knife up, and only then did he realize that he had
hit the women. Warren testified that these were "good size

women" and he is a small man, and that when he went to give assistance to one of the women, she responded by "slinging [him] around like a rag doll." When—open-bladed knife in his hand—he attempted to help the woman (identified as Della May Richter), she said "okay" and got into his truck, Warren said, and only then did he see the blood on her and realized that he had stabbed her.

Warren's recitation of the events is substantially undermined by the evidence collected at the time. Warren gave a detailed four-page statement to the police several hours after the incident. In that statement, he made no mention of a pothole, but said that immediately before hitting the women, he had spilled his beer and had looked down for a second. His statement made no mention of a knife sliding off the seat, or that he had been smoking marijuana, and although the statement certainly said that he had been drinking beer, the quantity described did not approach the 3 to 4 six-packs that he claimed in the post-conviction hearing. The evidence is inconclusive as to how intoxicated Warren actually was at the time of the incident. Blood and urine tests taken several hours later—shortly before he made his statement to the police—showed low levels of alcohol and no traces of marijuana in his system. Furthermore, the state had a witness who was prepared to testify at trial that Warren drove past the women slowly, stopped, turned around, and drove back toward them. It was the State's theory that Warren had been stalking the women, and after intentionally running into Ms. Weaver, he abducted and murdered Ms. Richter. Warren was eventually charged with two counts of first degree murder and "especially aggravated kidnaping."[1]

---

[1] In his statement to the police, Warren described in some detail how he had struggled with Ms. Richter before he stabbed her; how, after determining that she was dead, he first put her body in the woods but, deciding that "that wouldn't work," he put her on the floor of his truck, covered the body with a brown coat, went to a friend's home where Warren's wife was and got her to take him back to his truck and tow it to their home. He then took his wife back to the friend's home, returned

While Warren was in custody, Dr. Gillian Blair, at the instance of Warren's counsel, performed a psychological evaluation of him and prepared a preliminary report for the court. Dr. Blair determined that Warren's overall I.Q. was 71, one point over the upper limit for mental retardation for purposes of imposition of the death penalty under Tennessee law. *See* TENN. CODE ANN. § 39-13-203(a). Dr. Blair concluded that "Mr. Warren functions within the upper limits of mental retardation and the lower limits of borderline intellectual level"; that he understood the charges against him, appreciated the likely outcome of trial if he were found guilty, and was able to work with his attorneys and understand his options if those options were explained in "concrete terms." Dr. Blair concluded that Warren was therefore competent to stand trial.

At Warren's counsel's request, the trial court scheduled a competency hearing to consider Warren's competency and mental retardation. In order to avoid the death penalty, Warren needed to show not only that he was sub-average in his intellectual functioning, that is, he had an I.Q. of 70 or below, but that he also had deficits in adaptive behavior, and that this mental retardation had manifested during the developmental period or by the time he reached age eighteen.

---

home in his wife's truck, put Ms. Richter's body into his wife's truck, took the body up the road some distance and, after removing the clothes, dumped the body, and returned home with the clothes. Once back at home, Warren set his truck on fire, and put Ms. Richter's clothes as well as those he had been wearing, including his brown work boots, his jeans and his blue pullover shirt, into the wood burner in the living room of their home. He then went to the friend's home and had supper with his wife and children. Returning home after supper, Warren and his wife saw the truck blazing. They summoned help, including the fire department, and after the police came and looked at the truck, they read Warren his *Miranda* rights, and soon thereafter took him to the place where he had hit the two women with his truck.

Warren was first charged with vehicular homicide, first degree murder, arson and aggravated kidnaping. The vehicular homicide charge was later changed to a second count of first degree murder.

*Id*. Warren's counsel did not believe that he would be able to demonstrate both the sub-average I.Q. and deficits in adaptive behavior, as required by Tennessee law, because in addition to Dr. Blair's report showing an I.Q. of 71 and competency to stand trial, the record established that Warren had been employed for many years, had a wife of nearly twenty years and children, whom he supported, had a driver's license, and had served in the military for a short time before being discharged for physical—not mental—reasons. Warren's counsel therefore did not believe that he would be able to demonstrate that Warren was not eligible for the death penalty under Tennessee law.

A month prior to the scheduled competency hearing, Warren's counsel began serious plea negotiations with the State in attempt to obtain a plea deal that would protect Warren from a death sentence on either or both counts of murder. He met with Warren, both during and following these negotiations, to explain the best- and worst-case scenarios, and Warren's options—including the option of entering a guilty plea premised on the State's agreement not to seek the death penalty. Warren eventually discussed the matter with his wife and daughters, and opted to enter a guilty plea to each count of murder in order to avoid the death penalty. His counsel testified that the decision was entirely Warren's, and that his lawyers did not coerce him to enter the plea.

Prior to accepting Warren's plea of guilty to two counts of first degree murder (and agreeing to the dismissal of the arson and kidnapping charges), the trial court questioned Warren at length to determine whether he understood the charges against him, his rights, the possibility that he might face the death penalty, and the effect of the guilty pleas. Satisfied that Warren's pleas were both knowing and voluntary, the trial court accepted them and thereafter sentenced Warren to two consecutive terms of life imprisonment. *Warren v. Tennessee*, No. M1999-1319-CCA-R3-PC, 2000 WL 1133558 (Tenn. Crim. App., Aug. 10, 2000).

On January 23, 1996, Warren filed a motion for post-conviction relief in state court, raising two claims: 1) That his guilty pleas were not knowing and voluntary because his decision was "heavily influenced" by the death penalty, which he did not know would not be an option if he were found to be mentally retarded; and 2) that his counsel was ineffective for failing to further pursue a hearing concerning mental retardation. After an evidentiary hearing, the trial court denied relief. The Tennessee Court of Criminal Appeals affirmed the denial, and the Tennessee Supreme Court denied review.

On February 4, 2002, Warren, acting pro se with the assistance of Inmate Legal Aide, mailed his 28 U.S.C. § 2254 petition for a writ of habeas corpus to the United States District Court for the Middle District of Tennessee. The cover letter included a handwritten note:

> The five dollar ($5.00) filing fee for a § 2254 Petition is forthcoming. A form must be processed through the Inmate Trust Fund account/Business Office–who will forward a check to the Clerk's Office. This may take upwards of 7-10 days.

But Warren did not even initiate the request for withdrawal from his inmate account until February 13, 2002–one day after the one-year statute of limitations had run. The withdrawal was approved on February 14, 2002, and the clerk received the filing fee on February 28, 2002. On February 28, 2002, the court returned Warren's § 2254 petition for failure either to pay the filing fee or to submit an application to proceed *in forma pauperis*. Warren re-filed his petition with proof of payment on March 5, 2002.

The district court then granted Warren's request for appointed counsel, and ordered supplemental briefing concerning the issues of equitable tolling of the statute of limitations under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110

Stat. 1214 (1996), and Warren's claim that his guilty plea was not knowing and voluntary. Following briefing, the district court found that Warren was entitled to equitable tolling,[2] and granted a writ of habeas corpus, holding that the state trial court's failure to hold a pre-plea competency hearing violated the Fifth and Fourteenth Amendment Due Process requirements that the guilty plea be knowing and voluntary. Lewis filed a request to alter or amend judgment, which was denied. This timely appeal followed.

## II.

Warren filed his federal petition for writ of habeas corpus after the effective date of AEDPA, the statute governing this court's inquiry. *Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). A federal court may not grant a writ of habeas corpus with respect to any claim adjudicated on the merits in state court unless such state adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1) and (2).

---

[2]While we do not reach this question, we express grave doubt as to whether equitable tolling was appropriate in this case. It is well-established that where a party sits on his rights, fails to take timely steps to complete the filing, and suggests that equitable tolling is justified solely because of ignorance of the law, equitable tolling is not appropriate. "It is well-settled that ignorance of the law alone is not sufficient to warrant equitable tolling." *Rose v. Dole*, 945 F.2d 1331, 1335 (6th Cir. 1991).

A state court adjudication is "contrary to" Supreme Court precedent under § 2254(d)(1), "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" and arrives at a different result. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court adjudication involves "an unreasonable application of" Supreme Court precedent under § 2254(d)(2), "if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular . . . case," or if the court unreasonably refuses to extend, or unreasonably extends, existing legal principles from the Court's precedents to a new context. *Williams*, 529 U.S. at 407. The state court's application must be more than incorrect or erroneous; it must be "objectively unreasonable." *Williams*, 529 U.S. at 409. This court reviews a district court's disposition of a habeas corpus petition *de novo*. *Bronaugh v. Ohio*, 235 F.3d 280, 282 (6th Cir. 2000).

The district court granted Warren a writ of habeas corpus based upon *Pate v. Robinson*, 383 U.S. 375 (1966), which it cited for the proposition that where evidence of a defendant's mental deficiencies raise doubt as to his competence, due process requires a competency hearing. Relying upon the report proffered by Dr. Blair, which stated that Warren functions "within the upper limits of mental retardation and the lower limits of borderline intellectual level," the district court found that the state court was on notice of Warren's mental deficiencies, and that *Pate* therefore required the court to hold a pre-guilty plea competency hearing.

Contrary to its characterization by the district court, the standard established in *Pate* for requiring competency hearings prior to trial or the entry of a guilty plea is not merely whether extant evidence raises "doubt" as to the defendant's capacity to stand trial, but rather whether evidence raises a "'bona fide doubt' as to a defendant's competence." *Drope v. Missouri*, 420 U.S. 162, 173 (1975)

(*quoting Pate*, 383 U.S. at 385). In Warren's case, the Tennessee court had before it a single piece of expert testimony regarding Mr. Warren's competence: the findings of Dr. Blair, Warren's own doctor. While Dr. Blair found that Warren possessed poor judgment and an I.Q. one point above the state-established upper limit of retardation, she nonetheless explicitly concluded that he was competent to stand trial.[3] This expert testimony was bolstered by evidence in the record, which established that Warren had been employed for many years, lived with his wife of nearly twenty years and his children, had a driver's license, and had served in the military for a short time before being discharged for physical—not mental—reasons. Accordingly, all the evidence available to the district court suggested that despite functioning at the upper-end of mental retardation, Warren was in fact competent to stand trial or enter a guilty plea. Given this evidence, we must conclude that the state court applied *Pate* in an objectively reasonable manner when it failed sua sponte to grant a pre-guilty plea competency hearing. The district court erred in concluding to the contrary.

The district court noted with sympathy, but did not specifically reach, Warren's claim that his guilty plea was neither knowing nor voluntary because he entered it out of fear that he might otherwise receive the death penalty, a fear that he now claims was groundless because his mental retardation made him ineligible for the death penalty. It is worth noting in this context that the district court denied Warren's petition for habeas relief premised on his claim that his trial counsel was ineffective for failing to pursue the scheduled hearing on mental retardation and for counseling Warren to plead guilty to avoid the death penalty. The district court held that the state court had adequately considered and developed the facts, and that the state court's application of

---

[3] The competency standard to stand trial is identical to the standard to plead guilty. *See Godinez v. Moran*, 509 U.S. 389, 397 (1993).

*Strickland v. Washington*, 466 U.S. 668 (1984), "to the properly developed facts was reasonable." The state court had held that Warren had not even attempted to show any prejudice from his counsel's allegedly inadequate performance, and the district court explicitly held that Warren's trial counsel had reviewed the facts that militated against a finding of mental retardation and had reasonably counseled Warren that he risked the imposition of the death penalty if he continued to trial. We think that this record amply supports the district court's finding. That being the case, we think Warren cannot demonstrate that his guilty plea, based on this reasonable advice of counsel, was not knowing and voluntary because he would not have been eligible for the death penalty as a matter of law.

For the foregoing reasons, we REVERSE the judgment of the district court granting the petition for a writ of habeas corpus.