RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 17a0215p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

AIRIZ A. COLEMAN,

*Defendant-Appellant.*

No. 16-3972

---

Appeal from the United States District Court
for the Northern District of Ohio at Youngstown.
No. 4:16-cr-00046-1—James S. Gwin, District Judge.

Argued:  August 3, 2017

Decided and Filed:  September 13, 2017

Before:  NORRIS, SUHRHEINRICH, and GRIFFIN, Circuit Judges.

---

## COUNSEL

**ARGUED:**  Benjamin Beaton, SIDLEY AUSTIN LLP, Washington, D.C., for Appellant. Karrie D. Howard, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee. **ON BRIEF:**  Allison L. Ehlert, EHLERT APPEALS, El Cerrito, California, for Appellant. Laura McMullen Ford, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

_____

**OPINION**

_____

SUHRHEINRICH, Circuit Judge.

## I. INTRODUCTION

Defendant Airiz Coleman (Coleman) was convicted by a jury of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). On appeal, he faults the district court for failing to order *sua sponte* a mental competency evaluation pursuant to 18 U.S.C. § 4241(a). We find no error and affirm.

## II. BACKGROUND

### A.    Pretrial Filings and Proceedings

On November 17, 2015, Defendant pointed a gun at Garry Valentine (Valentine), a recovery agent with a vehicle repossession company, and threatened to shoot him. As a result, he was indicted on charges of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). At his arraignment, Defendant acknowledged his presence in federal court, but challenged the court's jurisdiction over him. Specifically, he contended that the government was "trying to charge [him] with" a "commercial crime" and that the United States could not be the victim of a commercial crime. Defendant also asked the magistrate judge if he was "forcing [Defendant] to contract," and referred to himself as a "flesh and blood living being." He claimed that his detention on "U.S. soil" was unconstitutional.

Several weeks later, Defendant's appointed counsel, Assistant Federal Public Defender Charles Fleming, moved to withdraw as counsel after Defendant became "combative" and "confrontational" during a meeting. At the hearing on the motion, Defendant told the court that he was present "on special appearance, [as a] third-party intervenor" and claimed that he was a "beneficiary and executor to the legal estate of the decedent[.]" Defendant stated that he had surrendered his birth certificate "to the Court for set-off, settlement[.]" He contended that he was not a corporation, an estate, or a legal fiction, but rather, was "a living man, . . . living

private on the land." And he "authorized" the court "to settle and close the account, case, constructive trust." Defendant also claimed that the court lacked "jurisdiction" and referenced his "copyright." The district court granted Fleming's motion, and ordered that Defendant receive other counsel.

Several days before trial, Defendant filed a *pro se* notice reiterating his challenge to the district court's jurisdiction. In it he explained that he is "a living man . . . not a 'corporate fiction' . . . [who] never signed any 'Contract' with the Public Defender's Office[.]" He also indicated that he had "appointed" "Respondent: James S. Gwin" "as Trustee to settle and close" the case. Defendant signed the notice as his own "Authorized Representative" and listed an address in "Warren, Ohio Republic," with a zip code in brackets. Defendant included an "AFFIDAVIT OF OWNERSHIP[,] Declaration of Nationality[,] Certificate/s of Titles[,] Birth Certificates" stating that he was a "Moorish American National," and claiming that using any of his titles mention in the declaration required payment of "1,000,000,000.00 PER HOUR UPON OCCURANCE [sic]." He further included several documents from the State of Ohio, his original birth certificate, and a "Common Law Copyright Notice" for his name. Finally, he attached a proposed "Order of Dismissal With Prejudice" pursuant to "Rule 12(b)(1)(2) of the Federal Rules of Civil Procedure" alleging "[t]he lack of subject-matter jurisdiction," and [t]he lack of personam jurisdiction."

## B. The Trial Testimony

Valentine was the first to testify. He stated that when he attempted to repossess Defendant's truck on November 17, 2015, pursuant to a repossession order, Defendant pointed a handgun approximately six or seven inches from Valentine's face and threatened to kill him. Defendant's wife intervened and Valentine was able to call the police.

Defendant gave his side of the story. According to Defendant, after his wife told him that Valentine was trying to repossess the truck, Defendant went home and tried to start the vehicle. It wouldn't start and Defendant asked Valentine what he had done to it. Valentine allegedly said that "[he] don't know nothing" and refused to provide any papers. Defendant's wife arrived.

After that Defendant noticed that Valentine had a gun and was "shaking" it. Defendant claimed that he smacked the gun from Valentine's hand, grabbed it, and put it in his house.

Pursuant to a search warrant, police found a loaded small black revolver with a white handle on the kitchen counter approximately two feet from the back door. The gun contained five rounds of ammunition and the hammer was "cocked back into a firing position," where "[a] slight pull of the trigger at [that] point would cause a bullet to go through that revolver." It was later determined that the firearm and ammunition were manufactured out of state.

The jury convicted Defendant of being a felon in possession of a firearm.

## C. Post-Trial Motion for New Counsel

After trial, Defendant filed a *pro se* motion to dismiss his second attorney, Fernando Mack. Mack's tenure as counsel lasted through the trial. In a supporting affidavit, Defendant claimed a conflict of interest because Mack demanded a fee in return for a winning verdict, which Defendant was unable to pay. He further accused Mack of failing to communicate with him and claimed that Mack was "unprepared" for trial. Defendant referenced the *Strickland* standard[1] in connection with his complaints against Mack.

At the hearing on Defendant's motion, Mack described Defendant as "pretty paranoid about [his] representation" because "[h]e felt like [Mack] was working for the government and this Court . . . had sent [Mack] to sabotage the case." Mack stated that "throughout" his communications with Defendant were difficult because Defendant insisted that they "would not discuss the facts of the case." Mack also stated that Defendant "was under the impression that if a particular document was read in open court by [Mack] [the court] would release him."

Defendant testified that Mack did not pursue a suppression motion as requested, citing the Fourth, Fifth, and Sixth Amendments. Defendant also claimed that he did not want to testify at trial, but Mack insisted he could not "argue facts for [Defendant] unless [Defendant] g[o]t on the stand and argue[d] facts." Defendant explained, however, that both he and his wife "didn't want to argue for a corporation," and that was why he "tried to be respectful" and said that he

---

[1]*Strickland v. Washington*, 466 U.S. 668 (1984).

wasn't the defendant, but a man.  Defendant described the impact his incarceration had on his family and his health.  Defendant insisted that "the debt has been taken care of."  The court relieved attorney Mack and appointed a new attorney—Defendant's third—to represent him at sentencing.

### D.    Sentencing

During allocution, Defendant told the court that, "This has been the worst seven months of my life," and that he only wanted to "be there for my family economically, physically, spiritually, and emotionally."  He described his difficult childhood, which included physical abuse, and stated that family was "everything" to him.  He also noted that he was the first person in his family to receive a bachelor's degree, and that he intended to obtain a master's degree.  In addition, he noted that he had "completed a play," which "FSP Records [wa]s backing."  He said that his past inspired him to be "a loving husband, a great father, a great leader, a coach, and a youth and adult mentor."  Defendant detailed the hardships his incarceration had on his family. His wife lost her mother and their son attempted suicide.  He told the court that he "never meant to dishonor anyone in this courtroom" and that he "always wanted to provide for my family."  He relayed the fact that he had saved another inmate's life while incarcerated, which "show[ed] [his] character."  He urged the court to send him home so that he could be there for his wife and children.

Lastly, Defendant stated that he had "a guaranteed job on anger management in LA with Charlie Sheen."[2]

Defendant's wife Renee also addressed the court.  She described Defendant as having "an overall calm demeanor."  She described him as "very thoughtful, helpful, respectful, caring, and open hearted."  Renee confirmed Defendant's accounts that he mentored adults in the community, was a coach, and that he had a "play that he was ready to produce at FSP Records."

The district court calculated an advisory Guidelines sentence of 37 to 46 months based on a base offense level of 20, and a Criminal History Category of II.  After considering the parties'

---

[2]Charlie Sheen starred in the FX comedy series *Anger Management*, which premiered on June 28, 2012.

statements and arguments and the applicable advisory Guidelines factors, the district court imposed a 36-month prison term.

Now, for the first time on appeal, Defendant argues that the court erred by failing to order *sua sponte* a competency evaluation.

## III. ANALYSIS

### A.    Standard of Review

The parties disagree as to the proper standard of review.  Defendant contends that we review the question of whether there was "reasonable cause" to order a competency hearing *sua sponte* for abuse of discretion, citing  *United States v Dubrule*, 822 F.3d 866, 879 (6th Cir.), *cert. denied*, 137 S. Ct. 252 (Oct. 3, 2016)[3], and the government claims that plain error review applies because this issue was not raised below, citing *inter alia, United States v. Allen*, 665 F. App'x 531, 533 (6th Cir. 2016), and *United States v. McBride*, 39 F. App'x 139, 142 (6th Cir. 2002) (per curiam).[4]  We need not decide in this case which standard is proper because Defendant's claim fails under either standard.

### B.    Merits

A district court is required to order a competency hearing *sua sponte* "if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense." 18 U.S.C. § 4241(a); *United States v. White*, 887 F.2d 705, 709 (6th Cir. 1989) (per curiam) (stating that "the district court has not only the prerogative, but the duty, to inquire into a defendant's competency whenever there is 'reasonable cause to believe' that the defendant is

---

[3]"A court abuses its discretion when it commits a clear error of judgment."  *Dubrule*, 822 F.3d at 879 (citation omitted).

[4]Under the plain error standard, we may consider relief for an error not raised below only if we find (1) error, (2) that is "plain," and (3) that affects the substantial rights of the defendant. *Johnson v. United States*, 520 U.S. 461, 466-67 (1997).  If these three conditions are met, then we may exercise our discretion to notice the forfeited error, but only if we find the error seriously affects the fairness, integrity, or public reputation of the judicial proceedings. *Id.* at 467.

incompetent to stand trial"). "[T]he bar for incompetency is high: a criminal defendant must lack either a 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' or 'a rational as well as factual understanding of the proceedings against him.'" *United States v. Miller*, 531 F.3d 340, 350 (6th Cir. 2008) (quoting *Drope v. Missouri*, 420 U.S. 162, 172 (1975)). In determining whether a defendant is competent, a court should consider evidence of irrational behavior, the defendant's demeanor at trial, and any prior medical opinion concerning competence to stand trial. *Id.* at 348 (quoting *Drope*, 429 U.S. at 180).

Defendant argues that his "bizarre statements over the course of multiple hearings and trial, and his interaction with his counsel—as reported by those attorneys—triggered reasonable cause to believe" that he did not understand the nature and consequences of the criminal proceedings and lacked the ability to consult with counsel to prepare his defense.

### 1.      Awareness and Understanding of the Proceedings

Defendant states that several instances of his behavior exemplify his lack of a rational understanding that he was facing criminal charges rather than a civil case. Defendant claims that the first tell-tale sign was his "[stringing] together legal jargon that made no sense." At the hearing on the motion to withdraw brought by his first attorney, Defendant stated that he was "here on special appearance, third-party intervenor, okay, who was injured by this action, and beneficiary and executor to the legal estate of the decedent[.]" He also believed that he could authorize the district court "to settle and close" the case and that he could "decline any more offers of imprisonment, fines, fees, or any other penalties." Second, Defendant argues that he "utterly fail[ed] to grasp that the jury had convicted him of a federal criminal offense[.]" At the hearing to remove Mack as counsel, Defendant repeatedly insisted that his "debt" had been taken care of, and the court was therefore required to release him from custody. Third, Defendant claims that his "abnormal splintering of the self" should have raised a red flag. At the hearing on his first attorney's motion to withdraw, Defendant characterized himself as the defendant's "surety," and at trial, as his "authorized representative." In his objections to the presentence report, Defendant claimed that he was not a defendant, but "a natural living man" (and not a U.S. citizen). Fourth, he displayed "a grandiose belief in his own superior knowledge," via his "belligerence with the prosecutor while being cross-examined at trial." In particular, Defendant

confusingly discussed his 2008 felony convictions, first claiming that he prevailed, then that he had taken a plea, and finally claiming that he had done so "unconsciously." He also read a "revised" passage from the Bill of Rights—his version of that document. Fifth, although "fairly lucid" at sentencing, Defendant allegedly made "lofty claims that suggested he was not fully connected to reality." This included his assertion that he was writing a play and had a "guaranteed job on anger management in L.A. with Charlie Sheen." Finally, the district court itself twice commented that Defendant was not making any sense.

However, as the United States points out, Defendant's legal arguments directly correspond to meritless rhetoric frequently espoused by tax protesters, sovereign citizens, and self-proclaimed Moorish-Americans. *See, e.g.*, *United States v. McLaughlin*, 675 F. App'x 387, 387 (4th Cir. 2017) (per curiam) (noting that the district court perceived the defendant's behavior as the product of his defiance and adherence to Moorish Nationalist ideals, rather than any mental instability or inability); *United States v. Amir*, 644 F. App'x 398, 399 (6th Cir. 2016) (rejecting the defendant's attempts "to argue that he is not a citizen of the United States, but a citizen of the 'Republic of Ohio,' to whom our federal courts' jurisdiction does not apply."); *Rott v. Oklahoma Tax Comm'n*, 604 F. App'x 705, 708 (10th Cir. 2015) (rejecting the *pro se* plaintiff's "trust arguments . . . that until the relevant government actor . . . establishes a commercial nexus, there is no 'taxpayer;' hence, no income"); *United States v. Neal*, 776 F.3d 645, 657 (9th Cir. 2015) (holding that the defendant's "numerous comments . . . disputing jurisdiction and other 'nonsensical' issues such as calling the United States a corporation" along with his profession of a sovereign citizen belief system did not display a lack of competence); *United States v. Sterling*, 738 F.3d 228, 233 n.1 (11th Cir. 2013) (noting that the phrases used by the defendant "are often used by so-called 'sovereign citizens, who believe they are not subject to the jurisdiction of the courts and who frequently deny that they are the defendants in the action, instead referring to themselves as third-party intervenors"); *United States v. Vallone*, 698 F.3d 416, 482 (7th Cir. 2012), (noting that the claim that one is a sovereign citizen and therefore not a citizen of the United States under the Fourteenth Amendment and the Code of Federal Regulations is "emblematic of tax protesters" and has been repeatedly rejected as frivolous by the courts)*, judgment vacated on other grounds sub nom. Dunn v. United States*, 133 S. Ct. 2825 (2013); *United States v. Benabe*, 654 F.3d 753, 767 (7th Cir. 2011) ("Regardless of an

individual's claimed status of descent, be it as a 'sovereign citizen,' a 'secured-party creditor,' or a 'flesh-and-blood human being,' that person is not beyond the jurisdiction of the courts."); *United States v. James*, 328 F.3d 953, 954-56 (7th Cir. 2003) (disruptive defendant who claimed that he was a Moorish national and "copyrighted" his name and sent invoices to government officials who used his name did not warrant a competency hearing). *See generally United States v. Gooch*, 595 F. App'x 524, 527 n.1 (6th Cir. 2014) (noting that "[i]n general, sovereign citizens believe that the United States Government, including the IRS, is a fraud and that 'they, the sovereign citizens, retain an individual common law identity exempting them from the authority of those fraudulent government institutions'" (quoting *A Quick Guide to Sovereign Citizens*, Univ. of N.C. Sch. of Gov't (Mar. 2013), http://www.sog.unc.edu/sites/www.sog.unc.edu/files/S overeign%20citizens%20brief%20guide%20Mar% 2013.pdf (last visited Dec. 15, 2014))).

Defendant's behavior resembles that of the defendant in *Neal*, who "professed a 'sovereign citizen' belief system." *Neal*, 776 F.3d at 657. There, the Ninth Circuit rejected the defendant's attempt to "use those beliefs as an expression of incompetency" in the absence of mental illness or uncontrollable behavior. *Id*. Similarly, the defendant in *United States v. James* claimed that he was a Moorish national and therefore required to obey only those laws mentioned in an ancient treaty between the United States and Morocco. *James*, 328 F.3d at 954. As part of that belief system, he claimed that he had a right to compensation every time his name was mentioned. *Id.* He also refused to cooperate with his appointed attorney. *Id*. The Seventh Circuit concluded that a competency hearing was not necessary because the only evidence of incompetence was "the unusual nature of [the defendant's] beliefs." *Id.* at 955. Like the defendant in *James*, Defendant's "obstreperous" behavior "does not cast doubt on his mental acumen; many a person with no defense would rather play games, and try to goad the judge into error, than face the music politely." *See id*. at 956. Similarly, Defendant's "back and forth" with his attorneys, the Assistant United States Attorney, and the court cannot be characterized as indicia of mental illness.

In short, although Defendant expressed views that are fringe, he did not exhibit irrational behavior before or during trial, or otherwise "act in a way that called his competency into question." *United States v. Denkins*, 367 F.3d 537, 547 (6th Cir. 2004); *see also Gooch*, 595 F.

App'x at 527 (stating that "merely believing in fringe views does not mean someone cannot cooperate with his lawyer or understand the judicial proceedings around him"; rejecting the defendants' claim that their sovereign citizens views cast doubt on their competence to stand trial).

The question remains whether Defendant's beliefs or other behaviors established a "deeper breakdown in . . . cognitive ability (i.e., ability to understand the ongoing legal proceedings)." *Gooch*, 595 F. App'x at 528. Again, the record establishes that Defendant had a "rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960) (per curiam).

That Defendant understood the criminal nature of the proceedings is reflected by the fact that he challenged the court's jurisdiction. He demonstrated his ability to make legal arguments, albeit atypical ones. He drafted a detailed affidavit, provided state documents, and cited case law, statutes, and constitutions. His trial testimony was designed to counter incriminating facts. Post-trial, he appropriately shifted the focus of his legal arguments, referencing the Supreme Court's *Strickland* standard in his *pro se* motion complaining about Mack's trial representation. Although Defendant reiterated his statements about the "claim against" him at the hearing on the motion, he acknowledged that the government, not an individual prosecutor, had a claim against him and corrected the court when it misspoke. In short, Defendant clearly knew what was going on.

Defendant also cooperated with the probation officer who prepared the presentence report. Other than refusing to provide his birth name, Defendant shared detailed personal information about his family, his physical and mental health, education, employment history, and finances. But, as the United States asserts, "[p]erhaps most telling" was Defendant's "articulate, passionate allocution" begging the court to return him to his family. Defendant explained how the incarceration had affected him, physically and emotionally, and detailed the hardships it imposed on his family. Defendant talked about his accomplishments, professional and personal. He pleaded with the court for the chance to get back to his family so that he could "continue [his] journey and success." Again, Defendant's swan song at sentencing reflects a carefully crafted

attempt to present himself as a virtuous man, good father, and community leader, a character very different than the one presented at earlier stages of the proceedings.

Defendant suggests that his statement about a job offer constituted evidence of "grandiose and possibly delusional thinking." Given certain similarities between his behavior and Charlie Sheen's behavior (both in real life and on television), it could also have been an attempt at rather ironic humor. Furthermore, his wife echoed many of Defendant's statements about his family relationships, community service, and the play he wrote. Finally, Defendant was, for the most part, respectful of the court and all the participants in the judicial proceedings. *Cf. Gooch*, 595 F. App'x at 528 (noting that the defendants "appeared to show respect, though disagreement, with the judge and standby counsel"). In short, nothing in Defendant's personal history, conduct in or out-of-court, provided a basis for the district court to doubt his competency.

### 2.    Ability to Communicate With Attorneys

Defendant also argues that "the evidence here raises a strong inference that [he] lacked the ability to consult with his attorneys and assist them in preparing his defense." In fact, the record reflects just the opposite. While he lacked the *desire*, he certainly had the *ability* to communicate. Defendant's refusal to discuss the facts of his case with Mack and further refusal to allow Mack to make arguments on his behalf, demonstrate an unwillingness to communicate, not an inability to communicate. As this court has recognized, "[t]he *decision* not to speak to one's lawyer is a defendant's prerogative, not a sign of mental incompetence." *Id.* In any event, the record reflects that the two *did* talk. Defendant himself admitted that he "was finally able to communicate with Mr. Mack" before trial, but Mack refused to file a suppression motion. Although Mack stated that Defendant was "pretty paranoid about [his] representation" because Mack was allegedly working for the government and the court, this is not an unusual view among those professing sovereign citizen beliefs. Without more, this does not establish lack of competence. Defendant also asked Mack to read a certain document in open court, which means that he did actually *did* discuss trial strategy with his attorney. "[W]hat matters is the defendant's ability to communicate with his lawyer and to understand the legal proceedings." *Id.* Additionally, Defendant's aggressive stance toward his first attorney, Fleming, did not render

him incompetent to stand trial. *See Miller*, 531 F.3d at 349 ("a defendant is not rendered incompetent to stand trial merely because he cannot get along with his counsel or disapproves of his attorney's performance"). Finally, Defendant has no history of mental illness, *see id.* at 348, and not one of his three attorneys or his wife suggested otherwise, *see Medina v. California*, 505 U.S. 437, 450 (1992) ("defense counsel will often have the best-informed view of the defendant's ability to participate in his defense").

## IV. CONCLUSION

In sum, simply espousing sovereign citizen and other fringe views does not necessarily demonstrate lack of competence, and nothing else in this record suggests that the experienced district judge should have questioned Defendant's competency to stand trial. We therefore AFFIRM the district court's judgment.