RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 19a0251p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

Nos. 18-5752/5777

HEATHER ANN TUCCI-JARRAF (18-5752); RANDALL KEITH BEANE (18-5777),

*Defendants-Appellants.*

Appeal from the United States District Court
for the Eastern District of Tennessee at Knoxville.
No. 3:17-cr-00082—Thomas A. Varlan, District Judge.

Decided and Filed: September 24, 2019

Before: SUTTON, COOK, and THAPAR, Circuit Judges.

_____

## COUNSEL

**ON BRIEF:** Dennis G. Terez, Beachwood, Ohio, for Appellant in 18-5752. Stephen L. Braga, UNIVERSITY OF VIRGINIA SCHOOL OF LAW, Charlottesville, Virginia, for Appellant in 18-5777. Anne-Marie Svolto, UNITED STATES ATTORNEY'S OFFICE, Knoxville, Tennessee, for Appellee.

_____

## OPINION

_____

SUTTON, Circuit Judge. Faced with financial challenges and rising unpaid bills, the individual has two legal options: shed the debts through the humbling act of filing for bankruptcy or find a new source of assets. Randall Beane, with Heather Tucci-Jarraf's assistance, tried to find a new source of assets: an alleged trust fund of government money in his

name.  But the money was not his, and along the way the two of them defrauded the United States of $31 million.  At their resulting criminal trial, they each asked to represent themselves, a request the court honored after holding a hearing on the matter.  The trial did not end well for either of them, as the jury rejected their array of fringe conspiracy theories.  On appeal, they argue that the trial court should have forced them to accept counsel in view of their unusual beliefs.  Because they knowingly and intelligently made this choice and because self-lawyering does not require the individual to subscribe to conventional legal strategies or other orthodox behavior, we affirm.

I

For years, Randall Beane honorably worked for our country, serving as an Air Force electrical engineer.  At some point he became convinced that the government was spying on the public, prompting a self-described "quest" into the world of conspiracy theories.  R. 165 at 168.  His internet research led him to the "straw man conspiracy theory."  The government creates for each new citizen, the theory claims, a legal identification—called a straw man—that allows the Federal Reserve to hold in trust that citizen's inherent "unlimited value."  R. 165 at 170.  Proponents believe that by filing paperwork with "the correct verbiage," R. 181 at 24, they can tap into these trust funds and use them as bottomless expense accounts.

Timing is everything.  This theory struck a chord with Beane at a vulnerable time, when he owed more money than he could pay on his vehicle, several credit cards, and four personal loans.

Before long, he came across the work of Heather Tucci-Jarraf, which did not help matters.  A former lawyer who once worked as a prosecutor and public defender, Tucci-Jarraf ran a website, posted videos, and contributed to talk shows about the straw man conspiracy theory.  She also produced several faux-legal documents that purported to allow individuals to access their secret trust fund accounts.  Seeing Tucci-Jarraf as a visionary who could "make a difference," Beane reached out to her.  R. 165 at 174.  She committed to help Beane dispose of his "old energy" and to "move forward and be creative" in getting his financial house in order. *Id.*

Beane found an outlet for his creativity. While browsing Facebook, he came across a video posted by an anonymous user under the moniker of *Batman*-villain Harvey Dent. *Id.* The video purported to teach viewers how to access their secret trust fund accounts. But in truth it taught them how to commit wire fraud by exploiting a deficiency in the "Automated Clearing House" network that banks use to transfer funds online. Beane discussed the video with Tucci-Jarraf. She offered her own advice about how to perform the technique and directed him toward potentially helpful documents.

On the evening of July 3, Beane gave the Harvey Dent idea a try. Logging onto his bank's website, he followed the video's instructions and entered the information it recommended. Account number? His own nine-digit Social Security number. Routing number? The Federal Reserve's. Using these credentials, Beane made fraudulent payments—in full—on his personal loans, his credit card debt, and his car insurance. Elated, Beane took to Facebook to spread word that he had "just paid off all [his] debts with [his] trust account." R. 165 at 182.

Easy as this was, Beane tried it again on July 5. This time, he bought Certificates of Deposit (CDs) with Federal Reserve funds. With Tucci-Jarraf providing moral support through video-conferencing software, Beane bought CD after CD. He didn't stop until his computer's mouse ran out of battery charge. Then he went to bed.

Beane awoke the next morning to find over $28 million worth of CDs in his bank account. Before long, he increased the total to $31 million. And before long, he started cashing the CDs. With his debt cleared up and plenty of cash now on hand, he bought an $86,000 truck as well as a half-million-dollar motor home that had two bathrooms, marble floors, and a fireplace.

Suspicious of his sudden fortune, one of Beane's banks froze his account. It also attempted to cancel the payments he made on his new truck and motor home. That's when Tucci-Jarraf reentered the picture. She advised Beane on how to protect his new assets by placing them in the name of a trust, and prepared pseudo-legal documents on his behalf. Claiming to be Beane's lawyer, she made phone calls to one of the banks and a dealership to

persuade them that he rightfully owned the money he was spending.  Her assurances worked, and the bank stopped cancelling the payments.

But just for a while.  By then, as it happens, a federal investigation had begun.  On July 11, federal officers learned that Beane planned to drive off the dealership lot in his new motor home.  Officers rushed to the scene, arriving just as Beane started the engine.  He refused to exit the vehicle, and agents had to remove him.  One of the motor home's other occupants provided officers with Tucci-Jarraf's phone number and requested that they contact her.  On the phone, Tucci-Jarraf claimed that she was "planning military operations."  R. 162 at 37.  Officers arrested her in Washington, D.C., where she had gone after contacting the Secret Service to request a meeting with the President.

Beane and Tucci-Jarraf responded to their arrests with a flood of frivolous motions.  They demanded hearings on their own identities, the identities of the arresting officers, and the identity of the presiding judge.  They asserted that United States courts cannot hold anyone "except by their own consent" and that the United States (a tad more plausibly) is a "bankrupt corporation."  R. 61 at 29, 61.  They submitted hundreds of pages of pointless Uniform Commercial Code filings, allegedly related to something called "The One People's Public Trust."  R. 18.  They mailed the court an itemized bill seeking payment of over $46 quintillion dollars.  On and on it went.  Concerned that such conduct might confuse a jury, the judge granted a motion in limine that barred the defendants from raising similar arguments at trial.

Beane and Tucci-Jarraf asked to represent themselves.  The judge held a hearing for each of them, complete with the standard-issue inquiries and cautions about self-representation.  The defendants provided some unusual answers, but after an extended colloquy the judge concluded that they had knowingly and intelligently waived their right to counsel.  He granted their requests.  As a safeguard, he granted their request to appoint standby counsel, who can help the defendant during the trial and who can take over if the judge ends the defendant's self-representation.  *See McKaskle v. Wiggins*, 465 U.S. 168, 176–78 (1984).

The defendants did their best.  They cross-examined the government's witnesses, introduced evidence, testified on their own behalf, and used their closing statements to justify

their worldview.  But their best was not good enough.  The jury convicted Beane of bank and wire fraud, 18 U.S.C. §§ 1343, 1344, and both defendants of conspiracy to commit money laundering, *id.* § 1956(h).

The court sentenced Beane to 155 months and ordered him to pay over a half-million dollars in restitution.  The court sentenced Tucci-Jarraf to 57 months.

II

Beane and Tucci-Jarraf have had second thoughts about representing themselves.  On appeal, they argue that the trial judge should have saved them from themselves.  No cause for reversal has been shown.

The right to counsel of the Sixth Amendment has paternalistic and libertarian components to it.  On one side, all defendants have the right to counsel in criminal cases, along with the right to have the government appoint counsel if the defendant cannot afford it, all to the end of ensuring that the government does not remove someone's liberty to live freely in society without sound legal representation.  U.S. Const. amend. VI; *see Gideon v. Wainwright*, 372 U.S. 335, 344 (1963).  On the other side, all defendants, whether lawyers or not, have a right to represent themselves—what amounts to the right to reject counsel and to confront the government alone. *See Faretta v. California*, 422 U.S. 806, 817–18 (1975).  Vindication of the goals of the second option often comes at the expense of the goals of the first.

Look no further than one reality of self-representation to see the tension.  While the Sixth Amendment guarantees a minimum level of competence that all criminal defense lawyers must meet during a criminal case, *see Strickland v. Washington*, 466 U.S. 668, 686 (1984), that guarantee does not apply to self-representation, *see Faretta*, 422 U.S. at 834 n.46.  The right to waive counsel includes the right to waive effective counsel.  The self-lawyer thus is free to behave as the eccentric his client selected, and that is no concern of the Sixth Amendment. *See Wiggins*, 465 U.S. at 177 n.8.  Libertarian indeed.

All of this confirms that, generally speaking, the only way out of the consequences of bad representation in a self-represented criminal trial is proof that the trial court erred in letting the

individual represent himself to begin with. Here are the two questions the trial court must answer affirmatively before it allows self-lawyering. Did the defendant expressly waive the right to counsel in a knowing and intelligent manner? *See United States v. Heard*, 762 F.3d 538, 542–43 (6th Cir. 2014). And did the defendant have the mental competence to quarterback his own defense? *See id.* at 543. If the answer to either question is no, the judge must appoint counsel. In all other cases, the defendant has the right, the constitutional right, to go it alone.

*Knowing and intelligent waiver.* The first question to answer is whether the defendants properly surrendered their right to counsel. We have oscillated on the appropriate standard of review, at times giving the issue a fresh look, at times reviewing for plain error, and at times omitting any discussion of the relevant standard. *See id.* at 542–43; *United States v. McBride*, 362 F.3d 360, 365 (6th Cir. 2004). Nothing turns on this distinction here.

When Beane and Tucci-Jarraf asked to represent themselves, they received all the vetting the law requires. The judge gave each defendant a proper *Faretta* hearing, during which he asked—and assessed their answers to—the full suite of required questions. *See id.* at 366. He also properly informed them of the severity of the charges against them and the risks of self-representation. *See United States v. Williams*, 641 F.3d 758, 766–67 (6th Cir. 2011). Despite these warnings, the defendants remained unequivocal that they wished to proceed alone. And their answers showed engagement with the risks and challenges of self-representation. Beane conceded his relative ignorance of the Rules of Evidence and Rules of Criminal Procedure. Tucci-Jarraf recognized that, despite having gone to law school and been a lawyer at one point, she'd need to "refresh" herself on them as well. R. 39 at 18. Both defendants also had the good sense to request standby counsel, even without the judge's prompting.

Other facts supported the court's decision. Both defendants previously held demanding jobs. Beane was an electrical engineer, Tucci-Jarraf a prosecutor and public defender. *See Iowa v. Tovar*, 541 U.S. 77, 88 (2004). Both had experience representing themselves in court. Beane did so in a civil dispute, Tucci-Jarraf in a criminal one. *See Parshay v. Buchkoe*, 427 F.2d 978, 980 (6th Cir. 1970). The alleged criminal conduct involved complex financial activity, demonstrating that both defendants had plenty of mental acuity. *See United States v. Abdulmutallab*, 739 F.3d 891, 902 (6th Cir. 2014). And although not dispositive, *see United*

*States v. Miller*, 531 F.3d 340, 348–50 (6th Cir. 2008), neither defendant has any documented "history of psychological problems," *Abdulmutallab*, 739 F.3d at 901.

Beane and Tucci-Jarraf nevertheless protest the knowledge and free will requirements of their waivers by pointing to portions of their *Faretta* hearing in which they gave odd answers to straightforward questions. When asked to be sworn in at the hearing, Beane and Tucci-Jarraf both initially replied by saying, "I am source of all that is." R. 39 at 13; R. 40 at 7. And Tucci-Jarraf flags some instances in which she quibbled over meaningless turns of phrase—the difference between the "true" and the "truthful" and the difference between "pro se" and "pro per" representation. R. 39 at 9, 13–14. But throughout these verbal quibbles, they listened carefully to the judge's questions and gave lucid answers. None of these answers suggested that they misunderstood the questions or had cold feet about representing themselves.

Beane argues that the judge shouldn't have let him self-lawyer at the same trial that Tucci-Jarraf self-lawyered because she once was an attorney. But Beane never thought Tucci-Jarraf was representing him at trial. The judge indeed "assure[d]" Beane that she could not do so, and Beane acknowledged as much. R. 40 at 17–18. Maybe Beane means only to say that he foolishly adopted Tucci-Jarraf's trial strategy. But that fact alone wouldn't justify severance, as it carries no "serious risk" of compromising one of Beane's "specific trial right[s]." *See Zafiro v. United States*, 506 U.S. 534, 539 (1993). And even if Tucci-Jarraf had advanced a defense directly antagonistic to Beane's, this would present an issue only if that defense had the potential to "mislead or confuse the jury." *See United States v. Bond*, 22 F.3d 662, 666 (6th Cir. 1994). No such issue arose. And at all events Beane never asked below to sever the trials.

*Competence*. Both defendants claim they should not have been allowed to represent themselves without a competency hearing. Mental incompetence is a "high" bar to clear. *Miller*, 531 F.3d at 350. To qualify, defendants must lack the wherewithal "to understand the nature and consequences" of the proceedings against them or to "assist properly" in defending themselves. 18 U.S.C. § 4241(a). Because this requires proof of a "deep[] breakdown" in cognition, *United States v. Coleman*, 871 F.3d 470, 477 (6th Cir. 2017), even patients with chronic severe mental illness often fall short of the threshold, *see United States v. Davis*, 93 F.3d 1286, 1290 (6th Cir. 1996). Trial judges must hold a competency hearing in the context of a *Faretta* claim only

where they find "reasonable cause" for concern.   18 U.S.C. § 4241(a).   This demands a "difficult," fact-intensive judgment call by the trial court, *Drope v. Missouri*, 420 U.S. 162, 180 (1975), one that generates a heap of deference, *see United States v. Stafford*, 782 F.3d 786, 791 (6th Cir. 2015).   Just how *much* deference is up for debate.   We've never decided whether to review for abuse of discretion or plain error.   *See Coleman*, 871 F.3d at 474.   No matter how you slice it, however, neither defendant clears either one of these lofty bars.

Beane and Tucci-Jarraf never gave the judge adequate cause to fear for their mental competence.   At all stages of the proceedings they stuck to the prescribed rules, interacted courteously with the court and prosecution, and collaborated effectively with their appointed standby counsel.   The government, notably, had to raise only a few objections at trial, all relatively minor.   And on the rare occasion when the judge provided instruction, they heeded it without protest.

Nor did Beane and Tucci-Jarraf's defense suggest they lacked the capacity to compete with the prosecution.   While they gave plenty of airtime to implausible conspiracy theories, they succeeded in other respects.   During cross-examination, they asked logical questions aimed at exposing gaps in the witnesses' knowledge and inconsistencies in the prosecution's narrative.   During their testimony, they successfully introduced helpful biographical details—information about their upbringings, their motivations, and their histories of government service.   And during their closing arguments, they clearly explained their belief system, and articulated why it led them to do what they did.   Sure, experienced counsel would have done a better job.   But that reality doesn't show the defendants were too incompetent to defend themselves.   Else, laypeople could never represent themselves.

Tucci-Jarraf separately challenges this conclusion on the ground that she should not have been permitted to *stand trial*, with or without a lawyer.   But we tend to treat both claims—this one and the one just addressed—as "identical."   *United States v. Gooch*, 850 F.3d 285, 289–90 (6th Cir. 2017).   Although trial judges *may* from time to time impose counsel on mentally-compromised defendants just competent enough to stand trial, *see Indiana v. Edwards*, 554 U.S. 164, 177–78 (2008), they aren't *required* to paternalize defendants in this way, *see Stafford*, 782 F.3d at 791.

That leaves the main challenge both defendants raise to their self-representation: that their idiosyncratic actions and unconventional beliefs established proof by themselves of unsound mind. But if committing murder does not automatically generate a competency hearing or incompetency finding, we are hard pressed to understand why fantastic financial crimes would automatically do so. *See, e.g.*, *Maggio v. Fulford*, 462 U.S. 111, 117 (1983) (per curiam); *Warren v. Lewis*, 365 F.3d 529, 533 (6th Cir. 2004). The hard reality is that the libertarian values of the Sixth Amendment allow individuals charged with crimes to act in unorthodox ways even if that compromises other values of the Sixth Amendment. Just as the First Amendment does not require the individual to accept the most defensible and battle-tested political views, *see W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943), so the Sixth Amendment does not require adherence to orthodox criminal defense strategies.

In case after case, we have rejected this argument for comparable reasons. *See, e.g.*, *Gooch*, 850 F.3d at 289; *Coleman*, 871 F.3d at 476; *United States v. Powell*, 847 F.3d 760, 775 (6th Cir. 2017). So have our sister circuits. *See, e.g.*, *United States v. James*, 328 F.3d 953, 955 (7th Cir. 2003); *United States v. Neal*, 776 F.3d 645, 656–57 (9th Cir. 2015). For its part, the Supreme Court has never suggested that eccentric worldviews, standing alone, establish mental incompetence. *See, e.g.*, *Cheek v. United States*, 498 U.S. 192, 195–96, 201 (1991). The hard fact is that intelligent people, even very intelligent people, can believe baffling things. The same brain that allows them to be very intelligent can, when combined with financial and other stresses, trigger all kinds of irrational behavior. Count Beane and Tucci-Jarraf among that number. Count also the thousands of other straw man conspiracy theory proponents nationwide. These individuals of course are misguided, some dangerously so. But that doesn't mean they inhabit a "private mental world" wholly divorced from reality. *James*, 328 F.3d at 955. And it certainly doesn't shield them from the consequences of their actions.

Membership in our democracy, sad to say, does not come with an unlimited trust fund, at least a financial one. But it does come with a view of the dignity of individuals to make weighty decisions for themselves. That's why they may reject life-saving healthcare, *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 278 (1990), consent to incriminating searches, *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973), conduct their own criminal defense as they see fit,

*Faretta*, 422 U.S. at 817–18, and—perhaps most harmful but rational all the same—confess to the commission of a crime, *Godinez v. Moran*, 509 U.S. 389, 396 (1993). Exercising these rights sometimes costs individuals more than they ever could stand to gain. But the Constitution lets American citizens learn that lesson the hard way.

III

Tucci-Jarraf separately contests the two-level enhancement she received for using her "special skill" as a lawyer to "significantly facilitate[] the commission or concealment" of a criminal offense. U.S.S.G. § 3B1.3. We see nothing improper about this enhancement, even if this skill did not prove effective at trial. The Sentencing Guidelines list legal training as a "special skill." *Id.* cmt. n.4. And the judge did not err in concluding that Tucci-Jarraf used that training to assist Beane in the "commission" and "concealment" of his fraud. Commission: Tucci-Jarraf advised Beane how to perform parts of the scheme. Concealment: Tucci-Jarraf's legal training helped her prepare documents that "increased [her] credibility" with the banks, which allowed her to delay the discovery of the fraud. R. 164 at 128.

Not quite so, counters Tucci-Jarraf. While she has experience as a practicing lawyer, the documents she produced and the arguments she made were devoid of real law. We agree that the arguments were frivolous, but that reality does not get her off the hook. Tucci-Jarraf's goal wasn't to fool a veteran attorney; it was to use legal jargon and official-looking documents to disorient bank and dealership employees. And she succeeded for a while. At trial, one bank employee testified that Tucci-Jarraf's identification of herself as Beane's lawyer "definitely played a role" in the bank's decision not to rescind payment promptly. R. 164 at 130. That sounds a lot like *United States v. Crosgrove*, where we upheld a special-skill enhancement because the lawyer "held himself out" as an entity's counsel, giving those who dealt with him the mistaken impression their claims would be "handled properly." 637 F.3d 646, 667 (6th Cir. 2011). So too for Tucci-Jarraf.

Sure, Tucci-Jarraf's efforts to protect Beane failed in the end. But that doesn't prevent the "special skill" enhancement from applying. Even ultimately "unsuccessful" conduct can "preclude[] further inquiry." *United States v. Atkin*, 107 F.3d 1213, 1220 (6th Cir. 1997). When

it comes to crimes like conspiracy, we require only that a defendant *intended* to employ her special skill in furtherance of a crime. *See, e.g.*, *United States v. Turner*, 272 F.3d 380, 390 (6th Cir. 2001); *see also, e.g.*, *United States v. Nelson-Rodriguez*, 319 F.3d 12, 58 (1st Cir. 2003); *United States v. Downing*, 297 F.3d 52, 65 (2d Cir. 2002). Successful or otherwise, Tucci-Jarraf harbored just such an intent.

We affirm.