NOT RECOMMENDED FOR PUBLICATION
File Name: 26a0279n.06

No. 23-3811

**UNITED STATES COURT OF APPEALS**

**FOR THE SIXTH CIRCUIT**

FILED

Jun 29, 2026

KELLY L. STEPHENS, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | |
| Plaintiff-Appellee, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| LORIN KAL BUCKNER, | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) ) | |

Before: BOGGS, CLAY, and GILMAN, Circuit Judges.

BOGGS, Circuit Judge.

Charged with offenses carrying the possibility of decades in prison, Lorin Kal Buckner elected to represent himself. In his new role as advocate, Buckner rejected the district court's repeated explanations of basic jurisdictional principles, disrupted proceedings with sovereign-citizen-style arguments, repeatedly refused to engage with the case before him, and instead pursued the imaginary case that he preferred. Having engineered much of the disorder that he now complains of, Buckner seeks reversal of his conviction on two counts of conspiracy to commit fraud on a variety of grounds. None warrants relief, so we affirm.

I

From about 2013 to 2019, Lorin Kal Buckner and his co-defendants ran a scheme to defraud homeowners facing foreclosure. Buckner and his team would instruct distressed

homeowners to make partial payments to them instead of to the mortgage company, while assuring their victims that Buckner and his company would negotiate a reduction or elimination of their mortgage payments. But they did nothing of the sort, making no bona fide attempt to perform services or to negotiate on behalf of the homeowners. Although they filed skeletal bankruptcy petitions for many homeowners, they did so with no intention of seeking relief for them, and the petitions were dismissed. The automatic stay provided for by the Bankruptcy Code only temporarily paused the foreclosures, enabling Buckner and his co-defendants to extract additional payments from their victims before many lost their homes. Furthermore, although Buckner prepared many of these bankruptcy petitions for a substantial fee, he perjuriously checked a box averring that no bankruptcy petition preparer had assisted in preparing the filings.

On March 6, 2019, Buckner was indicted in the Southern District of Ohio on numerous counts of fraud, though a superseding indictment returned in October 2022 narrowed his charges to one count of conspiracy to commit mail and wire fraud and one count of conspiracy to commit bankruptcy fraud. Buckner was represented by two court-appointed attorneys before deciding that he wanted to represent himself, so in May 2020, the court held a *Faretta* hearing to satisfy itself that his waiver of the right to counsel was knowing and voluntary. *See generally Faretta v. California*, 422 U.S. 806 (1975).

The court began the hearing by warning Buckner that self-representation was dangerous because the defendant "may miss something or may not do something that is possibly the smartest way to defend the case." The court then explained that the criminal proceedings would be governed by the Constitution, any relevant precedent, the Federal Rules of Criminal Procedure, and the Federal Rules of Evidence, and that Buckner could therefore be at a disadvantage without counsel. When asked for his "thoughts on that," Buckner affirmed that he could apply these bodies

2

of law on his own, stating: "I can do that." The court also asked whether he "had any concept of what those documents are and what they mean[,]" and Buckner replied that he did recognize the Constitution and "[s]ome" of the Federal Rules of Evidence.

The court then explained each of the crimes that Buckner had been charged with, the significant penalties involved, and the possibility that he could go to prison for a long time. When asked whether he was aware of these penalties, Buckner answered yes. The court also asked whether Buckner was familiar with the Sentencing Guidelines, and he replied that, in general terms, he was. The court explained that it could not relax any legal rules simply because Buckner was proceeding pro se, and it warned Buckner that it could not offer him any legal advice were he to become confused. The court asked him whether he understood this. After Buckner said that he did, the court again admonished him that self-representation was highly unwise and asked whether he still wished to represent himself; Buckner affirmed that he did. Based on this colloquy, the court found that Buckner had knowingly and voluntarily waived his right to counsel.

In November 2021, however, Buckner had a fleeting change of heart. He requested and received court-appointed counsel due to an unexpected medical issue, although several months later he again informed the court that he wanted to proceed pro se. So the court held a hearing in July 2022, where it had a renewed colloquy with Buckner about the possibility of significant jail time and the dangers of self-representation, reaffirmed its prior finding that Buckner's waiver was valid, and appointed him standby counsel.

Buckner's decision to go it alone went about as well as might be expected. He pursued what might be described as a two-track defense strategy, alternating between legal and pseudo-legal strategies. While at times making normal but misguided legal arguments, he also bombarded the court with the conspiratorial filings and commercial-law jargon characteristic of "sovereign

citizens" and related groups, particularly from the eve of trial onward.[1]  Consistent with this ideology, Buckner treated his criminal case as a commercial-accounting dispute.  Thus, Buckner attempted to "settle" his "account" by filing notices "accepting" and "returning" his indictment as though it were a defective commercial instrument.  *See, e.g.,* "NON-NEGOTIABLE NOTICE OF ACCEPTANCE," R. 297*;* "Notice of Rescission," R. 298; Mot. to Vacate J., R. 421, PID 3271 ¶5.  At trial, Buckner made a brief opening statement in keeping with this ideology, called no witnesses of his own, and would often simply recite "I accept and return it for settlement" instead of cross-examining the government's witnesses.  *See, e.g.,* Trial Tr., R. 518, PID 4180; R. 520, PID 4440, 4519, 4531, 4536.

In other filings, Buckner treated his various notices "returning" or "rescinding" the case as bills that the government had "dishonored" through its "nonacceptance or nonpayment," which, in his mind, discharged him of any responsibility in the case.  He also frequently insisted that the court lacked jurisdiction over him absent "a signed contract or other commercial agreement."  Buckner's pro se filings were replete with many other sovereign-citizen talking points as well, including repeated rhetoric about the Uniform Commercial Code and the notion that his court proceedings involved only a corporate shell identity distinct from his flesh-and-blood person. To top it off, Buckner interspersed his filings with quasi-religious bombast, such as declarations of penitence for his sins unrelated to the charged offenses and broadsides against "Traitors, Protestants, Liberals and Heretics."

[1] *See A Quick Guide to Sovereign Citizens*, Univ. of N.C. Sch. of Gov't (Mar. 2013), http://www.sog.unc.edu/sites/www.sog.unc.edu/files/Sovereign%20citizens%20brief%20guide%20Mar%2013.pdf.

Following trial, a jury convicted Buckner on both counts, but Buckner persisted. At his October 2023 sentencing hearing, he continued to demand "proof" of jurisdiction and fulminated about the court's purported lack of it. With commendable patience, however, Judge Barrett repeatedly explained that the court had jurisdiction, why it had jurisdiction, and that Buckner would be held in contempt if he continued to filibuster. After another torrent of interruptions, the court finally found Buckner in criminal contempt, ordered him detained until the hearing could resume the next day, and memorialized its contempt finding in a same-day written order.

The next morning, Buckner was sentenced to 120 months of imprisonment for his jury convictions. Now represented by counsel on appeal, he alleges various errors in his criminal proceedings.

## II

Buckner first alleges that he did not knowingly and voluntarily waive his Sixth Amendment right to counsel. We typically review an unpreserved challenge to a defendant's waiver of the right to counsel de novo. *United States v. Johnson*, 24 F.4th 590, 600–01 (6th Cir. 2022). That said, plain-error review may "apply to the extent [Buckner] claims he should have obtained a [new] waiver assessment" following a purported change in circumstances. *United States v. Sealy*, 2025 WL 869511, at *2 (6th Cir. Mar. 20, 2025) (citation modified). However, "[w]e need not determine which standard applies here because [Buckner's] appeal fails under either standard." *Ibid.* (citation modified).

Buckner's challenge to the district court's initial *Faretta* colloquy in May 2020 is a narrow and perfunctory one. He appears to fault the district court for asking leading questions that required only yes or no answers. Appellant Br. at 1, 15, 25. But we have said that in order for a defendant to make a valid waiver of his right to counsel, "the [district] court must ask [him] a

5

series of questions drawn from, or substantially similar to, the model inquiry set forth in the *Bench Book for United States District Judges*." *United States v. McBride*, 362 F.3d 360, 366 (6th Cir. 2004) (citation modified). That inquiry consists almost entirely of "leading," yes-or-no, questions such as: "You realize, do you not, that if you represent yourself, you are on your own?" *See United States v. McDowell*, 814 F.2d 245, 251–52 (6th Cir. 1987) (reproducing the text of the inquiry). Indeed, we have approved yes-or-no inquiries that cover nearly the same points as the district court did here. *See United States v. Miller*, 910 F.2d 1321, 1325 n.3 (6th Cir. 1990).

Moreover, the relevant question is not whether the colloquy was "leading," but whether it was "substantially similar" to the model inquiry. *McBride*, 362 F.3d at 366. That standard merely requires that the district court satisfy the model inquiry's core "objectives" and address its "relevant considerations," including "the defendant's familiarity with the law, the gravity of the charges, and the dangers of self-representation." *United States v. Bankston*, 820 F.3d 215, 225, 227 (6th Cir. 2016) (citation modified). There is little question that the district court addressed those topics in some depth, and Buckner does not appear to argue otherwise. Nor does anything in Buckner's original colloquy indicate that he failed to grasp the district court's questions; to the contrary, his answers were cogent and lucid. His objection to the initial inquiry is therefore unpersuasive.

That brings us to Buckner's primary *Faretta* argument: that, after the initial inquiry, the district court should have reassessed Buckner's waiver once it became apparent that he was not pursuing a conventional defense strategy. A valid waiver of the right to counsel remains effective absent a "substantial change in circumstances" that would alert the district court to the need for a new inquiry. *McBride*, 362 F.3d at 367. Buckner asserts that his onslaught of strange pseudo-legal

6

submissions, especially near the eve of trial, represents just such a change, in that these filings demonstrated his profound confusion about the law.

Yet "[i]t is clear that no degree of legal knowledge is required to knowingly and intelligently demand the right to represent oneself in a criminal proceeding." *McDowell*, 814 F.2d at 250 (citing *Faretta,* 422 U.S. at 836). Indeed, pro se litigants often get the law catastrophically wrong. So, "[t]he *only* condition on this right is that it be asserted by the accused with his 'eyes open.'" *Ibid*. The fact that courts must, accordingly, inquire into a defendant's familiarity with the law to ensure that he appreciates his own lack of legal training does not mean that a defendant must actually be knowledgeable about the law—although Buckner repeatedly attempts to blur this distinction. *See, e.g.*, Oral Arg. at 12:27. And by acknowledging that he was familiar only with the Constitution and "some" evidentiary rules when asked about various bodies of federal law, Buckner effectively "conceded his relative ignorance of the Rules of Evidence and Rules of Criminal Procedure." *United States v. Tucci-Jarraf*, 939 F.3d 790, 794–95 (6th Cir. 2019). The district judge then warned Buckner, in substance, that his legal ignorance could cost him years in prison, and Buckner said that he understood. In other words, his eyes were open. *See id*. at 794.

Thus, contrary to Buckner's suggestion, merely espousing fringe legal theories does not show a misunderstanding of the perils of self-representation. In fact, legally cornered defendants may turn to sovereign-citizen tactics because they "would rather play games, and try to goad the judge into error, than face the music politely." *United States v. James*, 328 F.3d 953, 956 (7th Cir. 2003) (Easterbrook, J.). Then, on appeal, such a defendant may attempt to turn this ruinous defense strategy into evidence of reversible error. However, the Constitution does not contemplate a heads-I-win, tails-you-lose approach to self-representation. And to the extent Buckner argues that his

7

beliefs were so delusional that he failed to grasp the criminal nature of the proceeding altogether, we address (and reject) such a claim below under the rubric of mental incapacity.

III

Buckner asserts that the district court erred by failing to order a competency evaluation in light of his bizarre filings. In relevant part, 18 U.S.C. § 4241(a) requires such an evaluation when there is "reasonable cause" to doubt the defendant's capacity to "understand the nature and consequences of the proceedings against him . . . ." Factors that may trigger "reasonable cause" include the defendant's irrational behavior, his demeanor, relevant medical evidence, and whether defense counsel has raised concerns about competency. *United States v. Dubrule*, 822 F.3d 866, 879 (6th Cir. 2016).

A district court's decision not to order a competency hearing is entitled to great deference. *United States v. Stafford*, 782 F.3d 786, 791 (6th Cir. 2015). However, "[o]ur caselaw has not yet resolved whether we review the decision not to order a competency hearing for abuse of discretion or plain error when, as here, the defendant did not request such a hearing in the district court. We too leave that issue unresolved, as the district court did not abuse its discretion, much less plainly err." *United States v. Patterson*, 2026 WL 768776, at *3 (6th Cir. Mar. 18, 2026) (citation omitted).

"In case after case, we have rejected" criminal defendants' attempts to recast their "idiosyncratic actions and unconventional beliefs" as evidence of an unsound mind. *Tucci-Jarraf*, 939 F.3d at 796; *Dubrule*, 822 F.3d at 876 (affirming that "even bizarre" legal views cannot by themselves "clear the high hurdle for incompetency."). And we have been particularly skeptical of efforts to treat "the meritless rhetoric frequently espoused by tax protesters, sovereign citizens, and self-proclaimed Moorish-Americans" as evidence of mental incapacity. *United States v. Coleman*, 871 F.3d 470, 476 (6th Cir. 2017); *see also Tucci-Jarraf*, 939 F.3d at 796–97.

8

*Coleman* is particularly pertinent. Criminal defendant Airiz Coleman (Coleman), like Buckner, expressed a desire to "settle and close" his case as though it were some sort of commercial account. 871 F.3d at 472, 475–76. Coleman also claimed to be in court "on special appearance" as a third party, *id.* at 472, 475, as did Buckner. Finally, like Buckner, Coleman insisted that the court lacked jurisdiction over him because he had never signed a contract. *Id*. at 472. On appeal, we rejected Coleman's argument, identical to Buckner's, that such statements showed his inability to comprehend that he was in a federal criminal proceeding rather than a civil commercial dispute. *Id*. at 475–76. Thus, absent evidence of a "deeper breakdown in cognitive ability," *id*. at 477 (citation modified), *Coleman* controls.

No such "deeper breakdown" took place. The record confirms that Buckner had a "rational as well as factual understanding of the proceedings against him." *Dusky v. United States*, 362 U.S. 402, 402 (1960). For years, Buckner helped coordinate a complex fraud operation, from which he pocketed over $180,000. His presentence report revealed no mental-health issues, and Buckner denied having any. His obstreperous behavior at sentencing notwithstanding, Buckner's demeanor throughout the proceedings was normal, and none of his court-appointed attorneys raised any concerns about his mental capacity. In short, he was a sophisticated offender of sound mind.

Buckner's engagement with the stakes and standards of criminal law throughout his proceedings confirms this assessment. Buckner filed pretrial motions seeking severance of defendants and dismissal due to claimed speedy-trial violations. Those submissions cited the pertinent Federal Rules of Criminal Procedure (such as Rule 14) and applicable criminal cases (such as *Barker v. Wingo,* 407 U.S. 514 (1972)). Buckner's closing argument at trial was equally lucid, albeit misguided. He contended that blame should ultimately rest with the homeowners responsible for paying their mortgages; that many of his "clients" kept their homes and thus were

9

not injured; that nobody saw him fill out a fraudulent bankruptcy form, creating "reasonable doubt"; that the government presented no documents in which Buckner expressly agreed to join a conspiracy, also creating "reasonable doubt"; and that when Buckner cross-examined him, one of the government's police witnesses admitted that he had testified about statements purportedly made by a homeowner without ever interviewing her. He then implored the jury to return a favorable verdict because "my life is hanging in the limbo of it"—an uncommon turn of phrase in commercial-accounting disputes. Following trial, Buckner filed an untimely Rule 29 motion for acquittal, arguing (among other things) that the prosecution had failed to prove various elements of the charged offenses "beyond a reasonable doubt" and expressly acknowledging that the government had brought a "criminal action." "In short, Defendant clearly knew what was going on," and "nothing in [his] personal history, conduct in or out-of-court, provided a basis for the district court to doubt his competency." *Coleman*, 871 F.3d at 477.

At oral argument, Buckner's counsel nevertheless insisted that "any human being could see" that Buckner was suffering a breakdown "in his mental faculties," yet counsel could point to no authority supposedly requiring district-court intervention under these circumstances, beyond *Indiana v. Edwards*, 554 U.S. 164 (2008). *See* Oral Arg. at 9:37–9:41, 10:26, 11:45–11:59. Buckner's attempt to analogize the anodyne facts of his case to the rather extreme ones of *Edwards*, apart from being unpersuasive, misses the point of *Edwards* altogether. After *Edwards,* "trial judges *may* from time to time impose counsel on mentally-compromised defendants just competent enough to stand trial, [but] they aren't *required* to paternalize defendants in this way." *Tucci-Jarraf*, 939 F.3d at 796 (citation modified). Buckner thus cannot fault the district court for a purely discretionary decision. *See Stafford*, 782 F.3d at 791.

Finally, Buckner places considerable weight on his statement at sentencing that "this whole thing feels like a criminal procedure," arguing that the remark showed his confusion about the nature of the proceeding. The district court, however, was entitled to treat that isolated comment as an expression of Buckner's longstanding refusal to accept the legitimacy of the criminal proceedings rather than as evidence that he genuinely failed to understand them, particularly considering his extensive history of otherwise intelligible legal argumentation.

IV

Buckner next makes several objections to the procedural reasonableness of his sentence, all unconvincing. We review these unpreserved sentencing challenges under the plain-error standard. *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc).

Buckner first contends that the district court violated Federal Rule of Criminal Procedure 32, which requires the court to "verify that the defendant and the defendant's attorney have read and discussed the presentence report ['PSR'] and any addendum to the report." Fed. R. Crim. P. 32(i)(1)(A) (citation modified). Buckner identifies only one potential consequence of the district court's supposed failure to verify his review of the PSR: that he might have objected to the two enhancements that he now challenges on appeal. Appellant Br. at 34. However, because those enhancement challenges utterly fail on the merits for the reasons discussed below, he has not met his burden of the "strenuous exertion" necessary to show "a reasonable probability that, but for the [plain] error," the outcome of his sentencing would have been different. *United States v. Dominguez Benitez*, 542 U.S. 74, 82–83 (2004) (citation modified); *see also Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016). He therefore cannot show that any alleged Rule 32 error prejudiced him. *See United States v. Olano*, 507 U.S. 725, 734 (1993) ("[T]he [plain] error must have been prejudicial: It must have affected the outcome of the district court proceedings.")

(citation modified); *United States v. Burleson*, 419 F. App'x 649, 652 (6th Cir. 2011) (applying *Olano*'s requirement for prejudice to plain-error review of unpreserved Rule 32(i)(1)(A) challenges).

As to his enhancements, Buckner first challenges the district court's application of a two-level enhancement for "a misrepresentation or other fraudulent action during the course of a bankruptcy proceeding." U.S.S.G. § 2B1.1(b)(9)(B). He argues that the evidence showed at most that he prepared fraudulent bankruptcy petitions before they were formally filed, not that he acted "during" a bankruptcy proceeding.

Buckner's temporal hair-splitting is unavailing. Fraud does not evaporate the instant the petition is filed. The false representation persists in and through the bankruptcy proceeding because the proceeding continues to operate based on the false filing. Hence, courts have read the enhancement to encompass pre-petition conduct, such as aiding a debtor in the concealment or transfer of assets prior to the filing of his bankruptcy petition. *See, e.g., United States v. Simpson*, 796 F.3d 548, 555 (5th Cir. 2015). The district court therefore did not err, much less plainly so.

Finally, Buckner argues that the district court plainly erred by adding a two-level enhancement for his being an "organizer, leader, manager, or supervisor in any criminal activity." U.S.S.G. § 3B1.1(c). "To qualify as a leader or organizer, the defendant must have exerted control over at least one participant in a supervisory, managerial, leadership, or organizational capacity." *United States v. Clay*, 162 F.4th 757, 779 (6th Cir. 2025) (citation modified). At trial, Buckner's former office manager testified that Buckner was the "president" of the company, participated in hiring her, and "yelled at me that I should get my ass in there" when she no longer wanted to come to work. One victim also testified that Buckner's nephew, Joel Harvey, served as Buckner's "assistant" and would "fill[] in" for him at times. Buckner's objection is therefore meritless.

V

Last and least, Buckner challenges the district court's summary criminal-contempt ruling under 18 U.S.C. § 401(1) and Federal Rule of Criminal Procedure 42(b), arguing that the evidence was insufficient to establish the requisite intent to obstruct the administration of justice beyond a reasonable doubt. *See In re Chandler,* 906 F.2d 248, 249 (6th Cir. 1990). We review exercises of the summary criminal-contempt power under the abuse-of-discretion standard and extend great deference to the district court's decision. *United States v. Martin*, 251 F. App'x 979, 981 (6th Cir. 2007). Before reaching the merits, however, we must ensure that we have jurisdiction.

The government correctly observes that we lack jurisdiction over Buckner's contempt challenge in light of Federal Rule of Appellate Procedure 3(c)(1)(B), which requires a notice of appeal to "designate the judgment—or appealable order—from which the appeal is taken." The district court memorialized its contempt sanction in a separate October 4, 2023 order, but Buckner's later notice of appeal referenced only the October 10, 2023 judgment of conviction on the underlying conspiracy counts. Nor does Buckner's October 4, 2023 pro se filing in district court, styled as a "NOTICE OF APPEAL," save the appeal. That filing designated no appealable order at all and merely rehashed his jurisdictional grievances; indeed, Buckner read it aloud at sentencing before the district court even found him in contempt. Because we have treated a criminal-contempt conviction as a "distinct, independent proceeding" that must be separately designated for appeal, Buckner's failure to identify the contempt order in either notice deprives us of jurisdiction over that issue. *United States v. Dews*, 1997 WL 259369, at *6 (6th Cir. May 15, 1997).

VI

At bottom, Buckner offers no principled basis for distinguishing his case from myriad sovereign-citizen appeals that we have repeatedly and emphatically rejected.  For the foregoing reasons, we **AFFIRM**.