RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0067p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

No. 13-4188

JOSHUA STAFFORD,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:12-cr-00238-5—David D. Dowd, Jr., District Judge.

Argued: March 11, 2015

Decided and Filed: April 10, 2015

Before: SILER, ROGERS, and COOK, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Brodie M. Butland, PORTER WRIGHT MORRIS & ARTHUR LLP, Cleveland, Ohio, for Appellant. Duncan T. Brown, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee. **ON BRIEF:** Brodie M. Butland, PORTER WRIGHT MORRIS & ARTHUR LLP, Cleveland, Ohio, W. Kelly Johnson, PORTER WRIGHT MORRIS & ARTHUR LLP, Cincinnati, Ohio, for Appellant. Duncan T. Brown, UNITED STATES ATTORNEY'S OFFICE, Cleveland, Ohio, for Appellee.

───────────────

## OPINION

───────────────

ROGERS, Circuit Judge. Following trial, Joshua Stafford was convicted of conspiring with four others to bomb a bridge near Cleveland. Stafford had a history of mental illness, but

after a competency hearing the district court found him competent to stand trial. Stafford on appeal challenges the district court's grant of his own motion, supported by his appointed counsel, to represent himself at trial. Although the district court could likely have exercised its discretion—recognized in the Supreme Court's holding in *Indiana v. Edwards*, 554 U.S. 164 (2008)—to impose counsel under the circumstances, it was not an abuse of that discretion in this case to grant Stafford's motion and permit Stafford to defend himself. The district court carefully examined Stafford's ability to represent himself, and standby counsel was provided. Also without merit is Stafford's challenge to the district court's application of a Guidelines enhancement for crimes of terrorism.

In early 2012, the FBI learned through a confidential informant of a possible terrorist cell led by Douglas Wright within the Cleveland-area spinoff of Occupy Wall Street. The informant had learned that Wright sought to attack financial institutions, bridges, and police in the Cleveland area. Over the course of a few months, Wright formed a conspiracy with four others to blow up a bridge. Wright first brought Brandon Baxter and Connor Stevens into the terrorist cell, and Anthony Hayne and Joshua Stafford joined a few days before the attempted bridge bombing.

Stafford first expressed interest in joining Wright's group on March 2, during a conversation with Wright, Baxter, and the confidential informant. But Stafford did not join the conspiracy until later because shortly after March 2, he left Cleveland for New York to participate in the Occupy Wall Street protests. While Stafford was in New York, the conspiracy crystallized when the co-conspirators developed a plan to plant explosives (purchased from an undercover FBI agent) at the base of the Route 82 Bridge outside of Cleveland on May 1 to coincide with an anticipated nationwide labor strike. Stafford returned from New York, and on April 27 he met with the confidential informant and Wright, who informed Stafford of the plan to bomb the bridge. Stafford agreed to help place the explosives. On April 29, Wright, Baxter, a new conspirator named Anthony Hayne, and the confidential informant bought gear and fake C-4 explosives from the undercover FBI agent. On April 30, Stafford and the co-conspirators planted the explosives, which they attempted to detonate using cellular phones. Soon afterward, the

conspirators were arrested. Stafford's co-conspirators all pled guilty, *see United States v. Wright*, 747 F.3d 399, 404 (6th Cir. 2014), while Stafford proceeded to trial.

Because of doubts about Stafford's competency—Stafford had twice attempted suicide while in jail—the district court held a hearing. At the hearing, both the government expert, Dr. Chad Tillbrook, and the defense expert, Dr. Sandra McPherson, acknowledged Stafford's history of mental health treatment, which included diagnoses of ADHD, atypical psychosis, oppositional defiant disorder, bipolar disorder, and auditory hallucinations. Although Dr. McPherson noted that Stafford suffered from a litany of mental health issues, she concluded that Stafford was competent to stand trial:

> [T]here was no question in my mind that he is competent, he is rational when it comes to understanding the Court system, he's – in the course of our conversations he knew who his attorneys were, he knew that there was a prosecution, he knew that he had co-defendants, he had positions with regards to those kinds of things in terms of co-defendants and with regard to options that his attorney would present to him that might be present in his case.

Dr. Tillbrook could not reach an opinion on Stafford's competence because Stafford had refused to cooperate with the psychological examination. The district court found Stafford competent to stand trial.

After the competency ruling, Stafford filed a typewritten letter with the court, styled as a "motion for self-representation and request for appointment of standby counsel." Citing *Faretta v. California*, 422 U.S. 806 (1975), Stafford argued that "the assistance of counsel [is] 'an aid to a willing defendant – not an organ of the State interposed between an unwilling defendant and his right to defend himself personally,'" and he requested that he be permitted to represent himself and that his court-appointed federal public defender be appointed standby counsel. After holding two hearings about Stafford's request, the district court granted Stafford's motion.

At the first hearing, the district court engaged Stafford in a *Faretta* colloquy modeled on the inquiry in the *Bench Book for United States District Judges*. *See United States v. McBride*, 362 F.3d 360, 366 (6th Cir. 2004). In addition to the standard questions, the court asked if Stafford had ever been involved in selecting a jury ("No."). When asked if he understood how juries were selected, Stafford replied, "Multiple questions are asked, and each jury member

answers, and they're struck depending on their answers or whether or not I feel that they can assess this or give a fair opinion on this jury – this trial." The court observed that "that's a pretty good answer" before providing a fuller explanation of jury selection. The court then explained to Stafford that he would be able to make an opening statement, cross-examine prosecution witnesses, present a case in his defense, and even—should he choose—testify in his defense, all of which Stafford indicated he understood. The court advised Stafford not to represent himself and gave him a ten-minute recess to consider further his request to proceed *pro se*. After the recess, Stafford said he still desired to represent himself with the assistance of standby counsel. The district court then found that Stafford had knowingly and voluntarily waived the right to counsel.

After the first hearing, the district court circulated a chambers-prepared memo to the parties analyzing the Supreme Court's decision in *Indiana v. Edwards*, 554 U.S. 164 (2008), as well as lower court decisions interpreting *Edwards*. The memo observed that in *Edwards*, the Supreme Court distinguished between a defendant's competency to stand trial and a defendant's competency to conduct trial proceedings. Under *Edwards*, a court may impose counsel on a defendant competent to stand trial but not competent to conduct trial proceedings himself. The memo concluded that the district court could "rely on previous competency hearings, the defendant's conduct, and the judge's other experiences with the defendant" in determining whether to prohibit the defendant from proceeding *pro se*. The district court then scheduled a hearing to discuss *Edwards*.

At the second hearing, the court asked Stafford several more questions, most of which focused on trial procedure. Stafford said he was "still learning" about trial procedure, and that he had begun to work on his opening statement. After these exchanges, the court then asked the prosecutor whether he believed any further questions should be asked. The prosecutor did not believe further questions were necessary, arguing that "the defendant ha[d] exhibited a very good knowledge of his case and also a very good working knowledge of starting to put together a case." The court then asked for defense counsel's thoughts, but noted that defense counsel was "not required to speak." Defense counsel said that he "agree[d] with the government" that Stafford was competent to represent himself. Defense counsel reasoned that, while Stafford had

"some mental issues," Dr. McPherson had testified that he was competent to stand trial and that Stafford was not suffering from "a major delusional mental illness like schizophrenia." Defense counsel noted that, "Every time we've come to court, [Stafford] has been respectful, he has been quiet, he's not been prone to outbursts, he has not shouted out bizarre things." According to defense counsel, Stafford "ha[d] not advanced any bizarre theories" of the case, "ha[d] discussed the evidence in a fairly rational[] manner," and had "demonstrated the ability to understand and learn" legal concepts. Based on these observations, defense counsel concluded that there was no "basis here to deny him his constitutional right to self-represent." The district court then ruled that Stafford could proceed *pro se*.

With the assistance of standby counsel, Stafford tried his case. He was convicted on all three counts: Conspiring to Use Weapons of Mass Destruction, 18 U.S.C. § 2332a(a)(2)(B) and (D); Attempting to Use Weapons of Mass Destruction, 18 U.S.C. § 2332a(a)(2)(B) and (D); and Attempting to Damage or Destroy Property Used in Interstate Commerce by Means of Explosives, 18 U.S.C. §§ 844(i) and 2. The trial was unremarkable. Stafford rarely objected, asked few questions on cross-examination, and called himself as the only defense witness, testifying that he believed the explosives were painting materials to graffiti the bridge.

At sentencing, the Government advocated for the application of the terrorism enhancement of U.S.S.G. § 3A1.4, which had already been applied by the district court to Stafford's co-conspirators. Stafford objected, arguing that he was unaware of his co-conspirators' motivations and did not intend to affect government conduct. The Government submitted a memorandum in support of applying the terrorism enhancement, which the district court adopted without further analysis. Most of the Government's memorandum dealt with the conspirators as a group, but the memorandum cited the following in particular with respect to Stafford: (1) Stafford's participation in the Occupy Wall Street protests; (2) his predisposition to join the bombing plot; (3) a conversation between Stafford and the co-conspirators on April 27 informing Stafford of the plot to bomb the bridge; (4) his participation in the attempted bombing; and (5) his comments about bombing McDonald's restaurants. The district court applied the enhancement. With the enhancement, Stafford had a total offense level of 36 and a criminal history category of VI, which produced a Guidelines range of 324 to 405 months' imprisonment.

The district court proceeded to vary downward, sentencing Stafford to a 120-month term of imprisonment and a lifetime term of supervised release.[1]

Stafford now argues that the district court should have rejected his request, supported by his counsel, to proceed *pro se*. The district court, however, did not abuse its discretion in permitting Stafford to represent himself. First, as evidenced by the chambers-prepared memo circulated to the parties, the district court was aware that *Edwards* permitted it "to insist upon representation by counsel for those competent enough to stand trial under *Dusky* [*v. United States*, 362 U.S. 402 (1960)] but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." *Edwards*, 554 U.S. at 178. The Supreme Court in *Edwards* permitted—but did not require—courts to impose counsel on defendants with mental issues who are nonetheless competent to stand trial. *Panetti v. Stephens*, 727 F.3d 398, 414 (5th Cir. 2013); *United States v. Ferguson*, 560 F.3d 1060, 1070 n.6 (9th Cir. 2009); *United States v. Berry*, 565 F.3d 385, 391 (7th Cir. 2009); *United States v. DeShazer*, 554 F.3d 1281, 1290 (10th Cir. 2009). The district court, in a thoughtful exercise of its discretion, declined to force counsel on Stafford. When determining whether a mentally ill defendant "falls in a gray area between *Dusky*'s minimal constitutional requirement that measures a defendant's ability to stand trial and a somewhat higher standard that measures mental fitness for" self-representation, *Edwards*, 554 U.S. at 172, the district court's decision merits deference. District courts "will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant." *Id.* at 177. The bare record that this court reviews on appeal is a poor substitute for the district court's personal observation of the defendant's demeanor and the district court's considered judgment of the defendant's ability to conduct trial proceedings. That holds true here, where the district court presided over three separate hearings on Stafford's competency: a hearing on whether Stafford was competent to stand trial—complete with expert testimony—as well as two further hearings on whether Stafford should be permitted to proceed *pro se*. During the latter two hearings, the

---

[1]The district court varied downward for each conspirator's sentence: "Wright was sentenced to 138 months in prison for each offense, significantly below the guidelines range, which the court calculated as 324 to 405 months. Baxter received a sentence of 117 months and Stevens 97 months, also well under the court's guidelines calculations of 262 to 327 months and 188 to 235 months, respectively. At Hayne's hearing, the court acknowledged that a 60-month minimum applied and sentenced Hayne to 72 months, down from a guidelines range of 262 to 327 months." *Wright*, 747 F.3d at 407.

district court questioned Stafford extensively.  Nothing occurred during these hearings to suggest that Stafford's mental illness would pose a barrier to his self-representation or implicate any of the concerns expressed by the Supreme Court in *Edwards*, *see id.* at 174–78.  Indeed, Stafford's request to proceed *pro se* was endorsed by his defense counsel, who agreed with the Government that Stafford was competent to represent himself at trial.  Moreover, Stafford was provided the assistance of standby counsel.

With respect to Stafford's sentence, the district court did not clearly err in finding that Stafford had the requisite intent to affect government conduct that justifies applying the terrorism enhancement of U.S.S.G. § 3A1.4.  The Sentencing Guidelines authorize a 12-level enhancement and increase in Criminal History Category to Category VI for a felony that "involved, or was intended to promote, a federal crime of terrorism."  U.S.S.G. § 3A1.4.  To be a federal crime of terrorism, the offense must be "calculated to influence or affect the conduct of the government by intimidation or coercion, or to retaliate against government conduct."  18 U.S.C. § 2332b(g)(5).  Application of the enhancement requires proof of the defendant's specific intent, i.e., proof that he "acted with the purpose of influencing or affecting government conduct and planned his or her actions with this objective in mind."  *Wright*, 747 F.3d at 408.  This court has already upheld the application of the enhancement to Stafford's four co-defendants.  *See id.* at 409–10, 417–19.

Several facts, viewed cumulatively, justify application of the terrorism enhancement to Stafford's sentence.  First, Stafford targeted government infrastructure.  Such a target, when great harm to innocent individuals is contemplated, is at least some evidence of intent to affect government conduct.  As we explained in *Wright*, "[s]o long as the defendant intended to influence [the] conduct of government, the terrorism enhancement will apply even if the defendant also harbored other motivations, such as an intent to gain financial reward or impress a sweetheart."  *Id.* at 418 (citing *United States v. Awan*, 607 F.3d 306, 316–18 (2d Cir. 2010)).  In this case no such alternative motivation has in any event been suggested.  Even if Stafford harbored other motivations, we observed in *Wright* that the defendants intended to affect government conduct because they "were aware of the consequences of their acts and chose to act

in ways that would bring about those consequences, even if they had other goals in mind, such as antagonizing the 'one percent.'" *Id.* at 410.

Other evidence supports the district court's conclusion that Stafford intended to affect government conduct. Wright, the leader of the conspiracy, believed that Stafford intended the bridge bombing as a revolutionary act. During a conversation recorded by the confidential informant, Wright said Stafford "wants to do revolutionary shit, but not the way that Occupy wants to do it, he wants to do it more like the way that we want to do it." Wright intended the bombing to affect government conduct, *see Wright*, 747 F.3d at 409–10, and Wright's endorsement of Stafford's revolutionary bona fides is some evidence of Stafford's intent. In addition, Stafford expected that the bombing would be perceived as an act of terrorism, as he joked with his co-conspirators that if they were caught, they would be "sittin' in the Caribbean sippin' on martinis" in Guantanamo Bay. While there was less evidence of Stafford's intent than for his co-conspirators, there was sufficient evidence such that the district court's decision to apply the enhancement was not clear error.

The judgment of the district court is affirmed.