NOT RECOMMENDED FOR PUBLICATION
File Name: 20a0540n.06

No. 19-5979

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Sep 18, 2020
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| KARL HOOD, | ) | DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |

Before: SUHRHEINRICH, LARSEN, and READLER, Circuit Judges.

LARSEN, Circuit Judge. Defendant Karl Hood was charged with possession of a firearm by a felon and possession of crack cocaine with intent to distribute. Again and again he insisted on proceeding to trial without counsel. After both a psychologist's expert opinion and a magistrate judge's report deemed Hood mentally competent, the district court granted his request for self-representation. A jury then convicted Hood on both counts. He now argues on appeal that the district court denied him his right to a fair trial by honoring his Sixth Amendment right to represent himself. We disagree and AFFIRM.

I.

In July 2016, an informant told police that Karl Hood was selling crack cocaine from his house. The police observed the area and enlisted the informant to buy crack from Hood. Based on this information, the officers obtained a warrant to search Hood's house, and upon execution, they found a large bag of crack cocaine, digital scales, over $1,000 in cash, and two firearms. The

government charged Hood with possession of a firearm by a felon, *see* 18 U.S.C. § 922(g)(1), and possession of crack cocaine with intent to distribute, *see* 21 U.S.C. §§ 841(a)(1), (b)(1)(B).

Hood's appointed attorney moved to suppress the guns and drugs based on a lack of probable cause supporting the warrant. The district court denied the motion, and Hood does not challenge that ruling on appeal.

Hood and his counsel did not always see eye to eye. While the suppression motion was pending, Hood submitted a pro se motion expressing displeasure with his appointed counsel. His attorney then filed a motion for psychiatric examination, which the magistrate judge granted. Hood filed two additional pro se motions before being transported to a medical facility for evaluation; each was denied for failure to act through counsel.

At the facility, both clinical and correctional staff "routinely observed" Hood for a month. A psychologist, Dr. Miriam Kissin, also examined Hood and detailed her observations from several interviews, as well as the observations of the staff, in a fourteen-page report. According to Dr. Kissin's report, Hood was "cooperative and related appropriately," he "maintained appropriate eye contact," and his speech was "coherent, logical, and goal directed." Although he had a history of mental health problems, Hood denied "having experienced any psychotic symptoms in years." Nor did Dr. Kissin observe any "psychotic symptoms" or signs of "any other significant mental illness." Hood's intellectual functioning fell within the "Borderline range," but Dr. Kissin found "no impairment" in his "capacity for effective interpersonal communication, capacity to follow instructions, or other areas of daily functioning." Dr. Kissin observed no "problematic or bizarre behaviors" from Hood and noted that he had a history of "feign[ing] mental illness for secondary gain."

Dr. Kissin also stated that during his interviews, Hood "was able to effectively process the information presented to him," and produced "an abundance of meaningful and often sophisticated information relevant to his legal case." For example, he held a "thorough knowledge and understanding" of the charges he was facing, their felony status, his potential to face prison time if convicted, what was reported in the police affidavit supporting the warrant, what happened during the execution of the warrant, and that he could plead guilty or not guilty. He also described the role of his attorney in defending him, the U.S. attorney in prosecuting him, the jury in determining guilt, and the judge in both sentencing and ensuring the parties were "correct and abiding the law." And, he explained that the trial court had previously denied his motion to suppress the guns and crack cocaine. From all of this, Dr. Kissin concluded that Hood held an understanding of the nature and consequences of the proceedings against him.

Dr. Kissin likewise determined that Hood was competent to assist his attorney in preparing his defense. Despite his "mistrust" of his attorney, he expressed a "clear understanding of the legal process in general." Hood could describe various procedures, including the process of plea bargaining, the role and nature of evidence, the burden of proof, and his general responsibility to "act 'civil'" in court. In addition, he understood his constitutional rights to remain silent and to trial by jury. And he "discussed several avenues of defense he intend[ed] to pursue." Though he continued to press his belief that "there was 'no legal reason' for law enforcement to enter his home for a search," Dr. Kissin found nothing to suggest "factors related to mental illness [were] driving [Hood's] thinking or decision-making process in his legal case." Dr. Kissin ultimately expressed her opinion that Hood was competent to stand trial. Once Dr. Kissin filed her report, Hood's attorney waived a competency hearing, and the district court agreed with Dr. Kissin's conclusion.

A month later, Hood's attorney moved to withdraw as counsel, recounting a breakdown in communication with her client. The court granted the withdrawal motion and appointed new counsel to represent Hood.

Hood's new attorney requested a second psychiatric examination, citing, as had his first lawyer, an inability to consult with Hood and make case-relevant decisions. The magistrate judge denied the request but encouraged counsel to engage a mental health expert for an independent evaluation. Hood's attorney did so, yet during an attempted evaluation by another psychologist, Dr. Kathryn Smith, Hood refused to be examined. His counsel then requested a competency hearing, asking that the court determine whether Hood was competent "to face trial and/or represent himself as he ha[d] requested at prior hearings."

At the competency hearing, Hood asked to represent himself, repeatedly talked out of turn, and would not follow the court's instruction to await his turn to speak. The court removed him from the courtroom to watch outside on a live video feed, and Hood's attorney attested that Hood had refused to speak with him.

Hood's attorney then called Dr. Smith to testify. Dr. Smith stated she "ha[d] some things to say," but was not "able to offer an opinion" about Hood's competence because he had refused to meet with her. She praised Dr. Kissin's "excellent evaluation" of Hood's competency as "very thorough" and "very clear." But she opined that some of Hood's "subsequent behavior" might have "called into question" his competence—specifically, his "disrupt[ing] court," his "refus[al] to work with his attorney," and his "fixation" on the validity of the search warrant. Smith did, however, concede that "it might be [Hood] . . . is choosing to behave this way because he thinks it's a strategy that's going to be effective somehow."

Following Dr. Smith's testimony, Hood returned to the courtroom and was permitted to testify. He explained that his competence was "irrelevant" to the case he was trying to build. He recognized that "if the search warrant [was] valid," then he might "have to do time," but he continued to insist that it was "an invalid search warrant."

The prosecution then called Dr. Kissin to the stand. She detailed the findings of her report and reiterated her conclusion that Hood had no "delusional, bizarre, unusual thinking on his part about his charges," nor did he have any other "symptoms of mental illness." She noted she had heard some of Hood's disruptive behavior in the courtroom, but "as far as a red flag, [she] didn't see anything alarming." Dr. Kissin further explained that "[p]eople act out in court all the time." And neither "acting out in court" nor "insisting on a defense strategy that is not viable" were necessarily indicative of mental incompetence. This was especially true given the concern that Hood had not exhibited "genuine symptoms" of psychosis in the past.

The magistrate judge found Hood mentally competent. He based this conclusion on three factors: (1) Dr. Kissin's report, (2) Dr. Smith's inability to offer an opinion, and (3) Hood's general ability to "act appropriately" in court in other hearings. Hood was "adamant . . . upon representing himself," and all of his disruptive behavior "focused solely on the issue of representation by counsel." This "mirror[ed] an identical manipulative strategy" a fellow inmate had used. The magistrate judge ultimately concluded that Hood's behavior was "not rooted in mental illness, but rather in some intentional strategy formulated by [him]." The district court adopted the magistrate judge's recommendation.

The magistrate judge then held a separate hearing to consider Hood's request for self-representation. To make Hood "fully aware of the various hazards and disadvantages . . . of

self-representation," the magistrate judge followed the Bench Book's[1] guidance to ensure Hood was knowingly and intelligently waiving his right to counsel. The court asked him about his formal legal training (none, but Hood claimed he was studying law while in jail), his education level (tenth grade), and his experience representing himself in court (none). The court then asked whether Hood understood each of the following: his right to an attorney; the charges against him and potential penalties; sentencing procedures; the court's inability to assist in his defense; the Federal Rules of Evidence and Federal Rules of Criminal Procedure and how they would not be relaxed because he was proceeding pro se; and finally, that a trained lawyer would likely "defend [him] far better than [he] could defend [himself]." To every question, Hood responded that he understood.

At one point in the hearing, Hood told the court he wanted to challenge the legality of the warrant. The court responded:

> [Y]our motion to suppress has been heard and ruled on. The Court is not going to hear again the same motion to suppress. You keep bringing up the same thing every time we come to court. . . . The Court has ruled that the officers did have probable cause to come into your house . . . . That issue has been decided.

The magistrate judge then warned Hood: "If . . . your legal strategy is to keep bringing up the motion to suppress that has already been decided, that's not going to go well for you," and Hood responded, "Okay." At the conclusion of questioning, the court cautioned Hood that "it [was] extremely unwise for [him] to try to represent [himself]," and "strongly urge[d]" him not to do it. Hood nevertheless confirmed that he still wanted to proceed without counsel, and that this waiver was "entirely voluntary." The court allowed him to proceed pro se.

---

[1] "Whenever a district court in the Sixth Circuit is faced with an accused who wishes to represent himself, the court must ask the defendant a series of questions drawn from, or substantially similar to, the model inquiry set forth in the *Bench Book for United States District Judges*." *United States v. McBride*, 362 F.3d 360, 366 (6th Cir. 2004).

At a pretrial conference, the court asked Hood if he still wanted to proceed without counsel. Hood said yes, and the court appointed standby counsel. Hood then persisted in arguing that he wanted to discuss the warrant at trial; the court refused, warning him that he would be cut off if he attempted to challenge the warrant's validity. During trial, Hood tried to bring up the search warrant several times and was repeatedly stopped by the trial judge.

The jury convicted Hood on both counts. After sentencing, Hood, acting pro se, filed a timely notice of appeal. Now represented by counsel, Hood challenges the district court's decision permitting him to represent himself at trial, arguing that he was not actually competent to do so.

## II.

In *Faretta v. California*, the Supreme Court held "that forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so." 422 U.S. 806, 817 (1975). This right, the Court said, is grounded in the Sixth Amendment. *See id.* at 821. Before permitting self-representation, though, the trial court must satisfy itself that the defendant: (1) has expressly waived his right to counsel in a knowing and intelligent manner, and (2) is mentally competent. *United States v. Tucci-Jarraf*, 939 F.3d 790, 794 (6th Cir. 2019). In making this determination, the defendant's "ability to represent himself has no bearing upon his competence to *choose* self-representation." *Godinez v. Moran*, 509 U.S. 389, 400 (1993). Rather, so long as the defendant is competent and effectively waives counsel, he "has the right, the constitutional right, to go it alone." *Tucci-Jarraf*, 939 F.3d at 794.

In this case, Hood concedes that he "knowingly and voluntarily waived his right to counsel." Only the competence question concerns us.

"Mental incompetence is a 'high' bar to clear." *Id.* at 795 (quoting *United States v. Miller*, 531 F.3d 340, 350 (6th Cir. 2008)). A defendant is competent to stand trial so long as no "mental

disease or defect" renders him unable to "understand the nature and consequences of the proceedings against him" or to "assist properly" in defending himself. 18 U.S.C. § 4241(a); *see also Drope v. Missouri*, 420 U.S. 162, 171–72 (1975); *Dusky v. United States*, 362 U.S. 402, 402 (1960). A defendant meeting this standard is also competent to waive the right to counsel. *See Godinez*, 509 U.S. at 398 ("[W]e reject the notion that competence to . . . waive the right to counsel must be measured by a standard that is higher than (or even different from) the *Dusky* standard."); *Tucci-Jarraf*, 939 F.3d at 795–96. Because a showing of incompetence "requires proof of a 'deep[] breakdown' in cognition, even patients with chronic severe mental illness often fall short of the threshold." *Tucci-Jarraf*, 939 F.3d at 795 (alteration in original) (quoting *United States v. Coleman*, 871 F.3d 470, 477 (6th Cir. 2017)); *accord United States v. Stafford*, 782 F.3d 786, 789, 791 (6th Cir. 2015) (upholding trial court's determination that the defendant was competent to stand trial and proceed pro se despite a "litany of mental health issues").

We also grant a trial court great deference in its assessment of a defendant's competence. *See Stafford*, 782 F.3d at 791; *United States v. Dubrule*, 822 F.3d 866, 877–78 (6th Cir. 2016). After all, through personal observation, the trial judge "will often prove best able to make more fine-tuned mental capacity decisions, tailored to the individualized circumstances of a particular defendant." *Indiana v. Edwards*, 554 U.S. 164, 177 (2008).

It is clear that Hood was able to understand the nature and consequences of the proceeding against him and had the ability to properly assist in his defense. Dr. Kissin's report detailed at length how Hood "was able to effectively process the information presented to him" and "offer[] an abundance of meaningful and often sophisticated information relevant to his legal case." Throughout Dr. Kissin's month-long evaluation, "[h]is speech was coherent, logical, and goal directed," and there was "no impairment" in Hood's "capacity for effective interpersonal

communication, capacity to follow instructions, or other areas of daily functioning." He evidenced "thorough knowledge and understanding" of the events resulting in his arrest, the precise charges filed against him, and the potential consequences if he was found guilty—including prison time. Further, Hood expressed a "clear understanding" of the trial process. He could articulate the respective roles of his attorney, the government, the jury, and the judge. And he could also explain various procedures and constitutional rights, including the process of plea bargaining, the role and nature of evidence, the burden of proof, his right to remain silent, his right to a jury trial, and his general responsibility to "act 'civil'" in court. At bottom, Dr. Kissin found "no indication of psychotic statements or signs consistent with any other significant mental illness." Hood was "without any symptoms for many years," and nothing suggested that "factors related to mental illness [were] driving [Hood's] thinking or decision-making process in his legal case." The district court was entitled to afford substantial weight to Dr. Kissin's considered evaluation, especially when Hood later confirmed his understanding at a competency hearing before the court. *See Dubrule*, 822 F.3d at 876.

To be sure, Dr. Smith testified at the hearing that Hood's behavior following Dr. Kissin's report might have "called into question" his competency—specifically, his "disrupt[ing] court," his "refus[al] to work with his attorney," and his "fixation" on the warrant. But the district court cannot be faulted for accepting Dr. Kissin's conclusion instead, for several reasons. First, unlike Dr. Kissin, Dr. Smith testified that she could not even "offer an opinion" about Hood's competence because he had refused her evaluation. Second, the magistrate judge conducting the hearing found that Hood was generally "able to act appropriately in the courtroom" and his disruptions "focused solely on the issue of representation by counsel." The magistrate judge found it "evident" that this disruption was a part of an "intentional strategy" on Hood's part to "achieve some result that he

views as a favorable outcome." Third, Dr. Smith herself conceded that in view of Hood's feigning symptoms in the past, he might have been "choosing to behave this way because he thinks it's a strategy that's going to be effective somehow." And Dr. Kissin agreed that Hood's behavior might have been strategically calculated. Fourth, Dr. Kissin countered at the hearing that neither "acting out in court" nor "insisting on a defense strategy that is not viable or reasonable" is necessarily relevant to competence. And she did not find it relevant in Hood's particular case. In such a battle of the experts, we will not lightly disturb a district court's finding of mental competence. *See Dubrule*, 822 F.3d at 877.

In response, Hood relies on *Indiana v. Edwards* to claim that his conviction must be vacated because, even if he was competent to stand trial, he was not sufficiently competent to act as his own attorney. It is true that *Edwards* recognized a category of defendants who "'fall[] in a gray area between *Dusky*'s minimal constitutional requirement that measures a defendant's ability to stand trial and a somewhat higher standard that measures mental fitness for' self-representation." *Stafford*, 782 F.3d at 791 (quoting *Edwards*, 554 U.S. at 172). But even if Hood were a "gray area" defendant, *Edwards* did not hold that it violates the Constitution to permit such defendants to self-represent. "Although trial judges *may* from time to time impose counsel on mentally-compromised defendants just competent enough to stand trial, they aren't *required* to" do so. *Tucci-Jarraf*, 939 F.3d at 796 (citations omitted); *see also Stafford*, 782 F.3d at 791 ("*Edwards* permitted—but did not require—courts to impose counsel on defendants with mental issues who are nonetheless competent to stand trial."). We know of no court that has read *Edwards* differently. *See United States v Bernard*, 708 F.3d 583, 590 n.11 (4th Cir. 2013) ("[A]s we do here, several circuits have interpreted *Edwards* to confer discretion, not to impose a new duty.") (collecting cases).

Hood's invocation of *United States v. Carradine*, 621 F.3d 575 (6th Cir. 2010), thus cannot help him. In the first place, *Carradine* is factually inapposite. There, the defendant "answered virtually every question" related to the nature of his charges, potential punishments, and other facts related to the case, "by stating that he did not understand." *Id.* at 579. Here, by contrast, when the magistrate judge posed questions from the Bench Book to ensure Hood's comprehension, Hood answered each and every one attesting that he did understand. But more to the point, in *Carradine*, the district court *denied* defendant's motion for self-representation. *Id.* at 578–79. We held that this was a constitutionally permissible exercise of the district court's discretion as recognized in *Edwards*, *see id.*, but nothing in *Edwards* commanded that result, *see Tucci-Jarraf*, 939 F.3d at 796; *Stafford*, 782 F.3d at 791; *Bernard*, 708 F.3d at 590 & n.11.

For similar reasons, Hood gains no ground by arguing that his "ability to present a defense at trial" suffered because of his "fixation with the search warrant" and his inability to understand the distinction between questions of law for the judge and questions of fact for the jury. A defendant is not "prevented from competently waiving his right to counsel because he 'articulate[s] beliefs that have no legal support.'" *United States v. Powell*, 847 F.3d 760, 775 (6th Cir. 2017) (alteration in original) (quoting *United States v. James*, 328 F.3d 953, 955 (7th Cir. 2003)). Nor is a defendant's "steadfast[] insiste[nce]" on pursuing a particular legal argument alone reason to doubt his mental competence. *United States v. Heard*, 762 F.3d 538, 542 (6th Cir. 2014). In cases like this one "where a criminal defendant elects to represent himself, 'the mere fact that [he] espouses a far-fetched, or even bizarre, legal-defense theory is insufficient to clear the high hurdle for incompetency.'" *Dubrule*, 822 F.3d at 876 (alteration in original) (quoting *United States v. Davis*, 515 F. App'x 486, 493 (6th Cir. 2013)). Thus, Hood's choice to ignore the district court's admonitions and continue to attack the warrant does not by itself show mental incompetence. All it

shows is that he "was simply unwilling to admit he was incorrect in his opinion." *Heard*, 762 F.3d at 542 (citation omitted).

Was Hood's subsequent performance at trial a model for effective advocacy? Assuredly not. "It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts." *Faretta*, 422 U.S. at 834. However, the district court did not err in honoring Hood's constitutional right of self-representation.

\* \* \*

We AFFIRM.